[No. B132774. Second Dist., Div. Five. Sept. 11, 2000.]

DOUGLAS BLACK, Plaintiff and Appellant, v.
DEPARTMENT OF MENTAL HEALTH et al., Defendants and
Respondents.

740

**COUNSEL**

Hardiman & Cahill and Francis X. Hardiman for Plaintiff and Appellant.

Bill Lockyer, Attorney General, Richard Rojo and Kenneth G. Lake, Deputy Attorneys General, for Defendants and Respondents.

## OPINION

**GODOY PEREZ, J.**—Douglas Black, acting as administrator of his deceased brother's estate, appeals from the judgment entered in favor of the State of California after the state's demurrers to the first amended complaint were sustained without leave to amend. For the reasons set forth below, we affirm the judgment.

### FACTS AND PROCEDURAL HISTORY

Craig Black (decedent) was a long-term mental patient at the former Camarillo State Hospital (Camarillo). With Camarillo set to close in June 1997, decedent's brother and conservator, Douglas Black (appellant), agreed in February 1997 to have decedent transferred to La Casa Mental Health Center (La Casa), a privately owned facility operating on the grounds of Metropolitan State Hospital (Metropolitan). On May 26, 1997, decedent died at La Casa. He was 54.

Appellant and his parents, Frank Bush Black and Zetta Frances Black, sued the State of California's Department of Mental Health (the Department) and the Department's director, Stephen Mayberg, along with Camarillo and Metropolitan. They also sued La Casa and its operator, Telecare Corporation (Telecare).[1]

The operative first amended complaint contained causes of action for wrongful death, violations of the elder abuse and dependent adult protection laws (Welf. & Inst. Code, § 15600 et seq.), medical malpractice, and negligent and intentional misrepresentation. It also included a survivor's action on behalf of decedent's estate (Code Civ. Proc., § 377.32)[2] alleging violations of the Unruh Civil Rights Act (Civ. Code, § 51, hereafter the Act). Appellant alleged he was duped into believing his brother had been transferred to Metropolitan, not an adjacent private facility where decedent would receive a lower level of care. While at La Casa, decedent was allegedly abused and neglected, and received inadequate medical care. Specifically, decedent was given incorrect dosages of lithium. Because the lithium levels in his blood were not properly monitored, decedent's mental and physical health deteriorated, resulting in his death, the first amended complaint alleged.

---

[1] For ease of reference, we will refer to Mayberg, the Department, and the two state hospitals collectively as the State. We will refer to La Casa and Telecare collectively as La Casa.

[2] Since a survivor's cause of action may be pressed only by a decedent's representative or successor in interest (Code Civ. Proc., §§ 377.20-377.35), and since the survival claim is the only cause of action at issue on appeal, as the administrator of decedent's estate, Douglas Black is the only proper appellant.

After incorporating all previous allegations, the Act cause of action alleged that the Americans with Disabilities Act of 1990 (42 U.S.C. § 12101 et seq., hereafter the ADA) was incorporated into the Act. A federal regulation implementing title II of the ADA, 28 Code of Federal Regulations section 35.130(d) (1999), made it unlawful to discriminate against mentally disabled persons such as decedent by failing to place them in the most integrated setting possible, consistent with their condition and treatment needs. Appellant alleged the State violated this regulation by inappropriately placing decedent at La Casa.

La Casa and the State brought separate demurrers to the first amended complaint. At the February 19, 1999, hearing La Casa's demurrers were sustained with leave to amend. The State's demurrers were sustained without leave to amend. A judgment for the State was entered March 12, 1999.[3] At issue on appeal is the demurrer to the Act claim, which was sustained on the ground the State was not a business establishment, as required by Civil Code section 51.[4]

---

[3]As a result, La Casa is not a party to this appeal, which is properly brought because the judgment was final as to the State. (*Justus v. Atchison* (1977) 19 Cal.3d 564, 567-568 [139 Cal.Rptr. 97, 565 P.2d 122], overruled on other grounds in *Ochoa v. Superior Court* (1985) 39 Cal.3d 159, 171 [216 Cal.Rptr. 661, 703 P.2d 1].) Appellant also informs us that a settlement has been reached with La Casa.

[4]While the State argues it is not a business establishment under the Act, appellant counters that the Act did away with any such limitation by incorporating the ADA in its entirety, including provisions which applied to public entities. Although the demurrers and the trial court's ruling were based on the issue whether the State was a business establishment under the Act, we need not resolve these issues of statutory interpretation and instead affirm on a different ground.

During our initial review of this appeal, our attention was drawn to 28 Code of Federal Regulations section 35.130(d)(1999) and the issue whether appellant had or could allege a violation of its integration mandate. We asked the parties for supplemental briefing on the proper interpretation and application of this regulation. We also asked the parties to discuss whether it was appropriate for us to resolve the appeal on this basis, specifically directing them to address any judicial admissions by appellant which showed that he had not and could not allege a violation of 28 Code of Federal Regulations section 35.130(d), along with any other pertinent matters which might be judicially noticed. Appellant's supplemental brief was restricted to the proper interpretation of that section and did not address the other issues raised in our request for further briefing. Appellant has therefore waived the issue whether we should resolve the appeal on this basis. We also deem this a concession of the binding effect of certain judicial admissions, which we will discuss *post*. If our initial impressions of the integration mandate's scope were correct, appellant agrees that an issue of law is presented. As such, resolution based on this new issue is proper. (*Zappas v. King Williams Press, Inc.* (1970) 10 Cal.App.3d 768, 771 [89 Cal.Rptr. 307].) Our conclusion is bolstered by the fact that state courts have concurrent jurisdiction of ADA claims. (*Jones v. Illinois Cent. R. Co.* (N.D.Ill. 1994) 859 F.Supp. 1144, 1145.) Accordingly, even if respondent is correct that appellant's ADA title II claim could not be brought under the Act, we would still have to determine whether remand was necessary so appellant could bring his cause of action directly under the ADA.

## STANDARD OF REVIEW

In reviewing a judgment of dismissal after a demurrer is sustained without leave to amend, we must assume the truth of all facts properly pleaded by the plaintiff-appellant. Regardless of the label attached to the cause of action, we must examine the complaint's factual allegations to determine whether they state a cause of action on any available legal theory. Reversible error is committed if the facts alleged show entitlement to relief under any possible legal theory. (*Cochran v. Cochran* (1997) 56 Cal.App.4th 1115, 1119-1120 [66 Cal.Rptr.2d 337].) The plaintiff-appellant bears the burden of showing how the complaint might be amended to state a viable cause of action. (*Hendy v. Losse* (1991) 54 Cal.3d 723, 742 [1 Cal.Rptr.2d 543, 819 P.2d 1].) We will affirm an order sustaining a demurrer which is correct on any applicable theory. (*Kennedy v. Baxter Healthcare Corp.* (1996) 43 Cal.App.4th 799, 808 [50 Cal.Rptr.2d 736].)

We will not, however, assume the truth of contentions, deductions, or conclusions of fact or law, and may disregard allegations that are contrary to the law or to a fact which may be judicially noticed. When a ground for objection to a complaint, such as the statute of limitations, appears on its face or from matters of which the court may or must take judicial notice, a demurrer on that ground is proper. (Code Civ. Proc., § 430.30, subd. (a); *Cochran v. Cochran, supra,* 56 Cal.App.4th at p. 1120.) We may take judicial notice of the records of a California court. (Evid. Code, § 452, subd. (d).) We must take judicial notice of the decisional and statutory law of California and the United States. (Evid. Code, § 451, subd. (a).)

## INTRODUCTION

The Act provides, in general terms, that all persons are entitled to free and equal accommodations, privileges, facilities and services in all business establishments. (Civ. Code, § 51.) It secures equal access to public accommodations and prohibits discrimination by business establishments. (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1150 [278 Cal.Rptr. 614, 805 P.2d 873].) In 1992, the Legislature amended the Act to state that a violation of a person's rights under the ADA was also a violation of the Act. (See Historical and Statutory Notes, 6 West's Ann. Civ. Code, § 51 (2000 supp.) p. 86.)[5]

Congress authorized the United States Attorney General to draft regulations implementing the provisions of the ADA. Those regulations must be

---

[5]We express no opinion as to whether the Legislature intended to incorporate the ADA in its entirety into the Act.

given both legislative and controlling weight unless they are arbitrary, capricious, or clearly contrary to the statute. (*Does 1-5 v. Chandler* (9th Cir. 1996) 83 F.3d 1150, 1153.) ▮▮▮▮ One such regulation is 28 Code of Federal Regulations section 35.130(d) (1999), the so-called integration regulation or integration mandate.[6] (*Olmstead v. L.C.* (1999) 527 U.S. 581, 592 [119 S.Ct. 2176, 2183, 144 L.Ed.2d 540] (hereafter *Olmstead*).) Section 35.130(d) states: "A public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." Appellant contends decedent's transfer from Camarillo to La Casa violated this regulation.

The first amended complaint alleged that appellant believed decedent was being transferred from Camarillo to Metropolitan. Decedent was instead transferred to La Casa, which was "possibly a separate and private entity" providing "a lower level of care and monitoring." Elsewhere in the first amended complaint, appellant describes La Casa as a "home/Mental Health Center." Appellant also alleged that the State acted negligently in decedent's transfer process and breached its duty to "properly evaluate decedent for community placement . . . ." The first amended complaint is silent as to any improper motivation or discriminatory effect from the transfer decision and simply concludes that the transfer violated the integration mandate.

Camarillo was a state hospital for the developmentally disabled (Welf. & Inst. Code, § 4440) whose primary purpose was to care for such persons. (Welf. & Inst. Code, §§ 4484, 7503, 7506.) Metropolitan is a state hospital for the mentally disordered (Welf. & Inst. Code, § 7200) whose primary purpose is the care of such persons. (Welf. & Inst. Code, § 4304.) We judicially notice these matters. (Evid. Code, § 451, subd. (a).)

Appellant's supplemental brief describes the "essence" of his integration mandate claim as the "transfer[] from a State Hospital to a community institutional facility." This occurred without appellant's consent. It was not based on decedent's medical needs but instead occurred "because of the need to find an alternative location to place the decedent because of the Legislature's closing of Camarillo. In other words decedent was placed into La Casa because of what was available rather than what was needed by the disabled person. [¶] [Appellant] is alleging that the integration mandate was violated [because decedent] was transferred to a setting that was less integrated because La Casa was not a facility that could meet [decedent's] treatment

---

[6]All further references to section 35.130(d) are to the 1999 version of title 28 of the Code of Federal Regulations.

needs." We treat these statements as judicial admissions. (*DeRose v. Carswell* (1987) 196 Cal.App.3d 1011, 1019 [242 Cal.Rptr. 368].)[7] We also assume appellant would amend his complaint to include those allegations.

Distilled to its essence, appellant's Act claim rises or falls on the contention that decedent should have been transferred from one state mental hospital to another, not to a private community care facility that was inadequate to handle decedent's treatment needs. This transfer occurred because Camarillo was closing. The State did not evaluate decedent to determine whether such a transfer was medically appropriate, but instead made its transfer decision based on what was available. This conduct violated section 35.130(d), according to appellant.

In requesting supplemental briefing, we asked the parties to discuss whether these allegations showed either a violation of the integration mandate (§ 35.130(d)) or that decedent had been the victim of discrimination "by reason of [his] disability, . . ." (42 U.S.C. § 12132.) As set forth below, we hold they do not.

### DISCUSSION

■ Since we are construing a federal statute, we must apply and interpret federal law. Decisions of the United States Supreme Court are binding. Lower federal court decisions are not. If federal precedent is either lacking or in conflict, we will independently determine federal law. (*Gervase v. Superior Court* (1995) 31 Cal.App.4th 1218, 1228-1229 [37 Cal.Rptr.2d 875].)

■ The rules of federal statutory interpretation are much the same as those used when construing California statutes. Our primary function is to give effect to Congress's intent. (*Trailer Train Co. v. State Bd. of Equalization* (9th Cir. 1983) 697 F.2d 860, 865, cert. den. (1983) 464 U.S. 846 [104 S.Ct. 149, 78 L.Ed.2d 139].) Unambiguous statutory language is conclusive absent clear proof of a contrary legislative intent. (*Consumer Product Safety Comm'n v. GTE Sylvania* (1980) 447 U.S. 102, 108 [100 S.Ct. 2051, 2056, 64 L.Ed.2d 766].) The words of a statute must be construed in context and statutes must be harmonized, both internally and with each other, to the extent possible. Interpretations which would render some terms surplusage,

---

[7]Appellant has consistently described his ADA claim in these terms. In opposition to the State's demurrer to the first amended complaint, appellant described the "essence" of his claim in similar terms: "[T]hat decedent . . . was inappropriately transferred from Camarillo and Metropolitan to a community facility, instead of being retained in the State Hospital where his complex treatment needs were most appropriately met, thereby violating . . . [the integration mandate]."

defy commonsense, or lead to mischief or absurdity are to be avoided. (*Pacific Mut. Life Ins. Co. v. Am. Guar. Life Ins.* (9th Cir. 1984) 722 F.2d 1498, 1500, overruled on other grounds by *Matter of McLinn* (9th Cir. 1984) 739 F.2d 1395.)

Congress explicitly made several findings in enacting the ADA. These include: "(2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem; [¶] (3) discrimination against individuals with disabilities persists in such critical areas as employment, housing, public accommodations, education, transportation, communication, recreation, *institutionalization*, health services, voting, and access to public services; [¶] . . . [¶] (5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, . . . overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, *segregation*, and relegation to lesser services, programs, . . . or other opportunities; [¶] . . . [¶] (8) the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals . . . ." (42 U.S.C. § 12101(a)(2), (3), (5), (8), italics added.)

In accord with these findings, Congress announced that it had several purposes in enacting the ADA: To provide a clear and comprehensive national mandate for eliminating discrimination against the disabled, along with clear, consistent and enforceable standards for doing so; to ensure that the federal government plays a central role in enforcing those standards; and to invoke the sweep of congressional authority, including the power to enforce the 14th Amendment and to regulate commerce, in order to address the major areas of discrimination faced daily by disabled persons. (42 U.S.C. § 12101(b)(1), (2), (3), (4).)

The ADA is the federal government's most recent and far-reaching effort to address discrimination against the disabled. Earlier efforts included the Rehabilitation Act of 1973, 29 United States Code section 701 et seq. (*Olmstead, supra*, 527 U.S. at p. 589, fn. 1 [119 S.Ct. at p. 2181].) Section 504 of the Rehabilitation Act was the first broad federal statute designed to prevent discrimination against the disabled. It provides that no qualified disabled person shall, "solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." (29 U.S.C. § 794(a).)

Title II of the ADA (42 U.S.C. §§ 12131-12165) deals with the provision of public services.[8] Under 42 United States Code section 12131, a state and its various departments and agencies are defined as public entities. Under title II, "no qualified individual with a disability shall, *by reason of such disability*, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." (42 U.S.C. § 12132, italics added.) The same standards that apply to section 504 of the Rehabilitation Act also apply to title II of the ADA. (*Helen L. v. DiDario* (3d Cir. 1995) 46 F.3d 325, 329-330, and fns. 7 and 8 (hereafter *Helen L.*).)

Since the ADA was designed to address indifference to or benign neglect of the plight of the disabled, outright intentional discrimination is not required under title II of the ADA. (*Helen L., supra*, 46 F.3d at pp. 334-335.) Unlawful discrimination occurs not just when the disabled are treated differently than the nondisabled. Claims based on discriminatory treatment between groups of disabled persons are also permitted. (*Id.* at pp. 335-336.)

In order to prove a claim for discrimination under title II of the ADA, a plaintiff must show: (1) that he is a qualified individual with a disability; (2) he was either excluded from participation in or denied the benefits of a public entity's programs, benefits or services; and (3) the public entity's conduct occurred by reason of his disability. (42 U.S.C. § 12132; *Weinreich v. Los Angeles County* (9th Cir. 1997) 114 F.3d 976, 978, cert. den. (1997) 522 U.S. 971 [118 S.Ct. 423, 139 L.Ed.2d 324].)

In accord with the regulatory power which Congress bestowed, the Attorney General adopted the integration mandate, which requires public entities to administer services "in the most integrated setting appropriate to the needs of qualified individuals with disabilities." (§ 35.130(d).) The preamble to the United States Attorney General's ADA title II regulations defines that language to mean " 'a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible.' " (*Olmstead, supra*, 527 U.S. at p. 592 [119 S.Ct. at p. 2183]; 28 C.F.R. pt. 35, appen. A, p. 487 (1999).)

The United States Attorney General's preamble also states: "Taken together, these provisions are intended to prohibit exclusion and segregation of individuals with disabilities and the denial of equal opportunities enjoyed by

---

[8]Title I of the ADA prohibits discrimination in employment (42 U.S.C. §§ 12111-12117) and title III prohibits discrimination in the provision of public accommodations. (42 U.S.C. §§ 12181-12189.)

others, based on, among other things, presumptions, patronizing attitudes, fears, and stereotypes about individuals with disabilities. Consistent with these standards, public entities are required to ensure that their actions are based on facts applicable to individuals and not on presumptions as to what a class of individuals with disabilities can or cannot do. [¶] Integration is fundamental to the purposes of the [ADA]. Provision of segregated accommodations and services relegates persons with disabilities to second-class status. For example, it would be a violation of this provision to require persons with disabilities to eat in the back room of a government cafeteria or to refuse to allow a person with a disability the full use of recreation or exercise facilities because of stereotypes about the person's ability to participate." (28 C.F.R. pt. 35, appen. A, p. 485 (1999).)

Conduct that violates the integration mandate is deemed to occur by reason of a plaintiff's disability and therefore satisfies that requirement of 42 United States Code section 12132. (*Olmstead, supra,* 527 U.S. at p. 597 [119 S.Ct. at p. 2185] ["Unjustified isolation [in violation of the integration mandate], we hold, is properly regarded as discrimination based on disability."].) Appellant relies solely on the integration mandate to show the State discriminated by reason of decedent's disability. Few decisions interpret this regulation. Those that do arise from the same general circumstances—where institutionalized disabled persons who are proper candidates for community-care or other noninstitutional treatment settings are denied access to such services by state officials.

In *Olmstead, supra,* 527 U.S. 581, the plaintiffs were two mentally retarded women being treated in Georgia state mental hospitals. Both women were medically evaluated and considered proper candidates for community placement services. Another regulation requires the states to make reasonable modifications to avoid discrimination against the disabled, but permits the states to resist modifications which would fundamentally alter their services and programs (the fundamental alteration defense). (28 C.F.R. § 35.130(b)(7) (1999).) The state contended that requiring community placements for the women would be too costly and would therefore fundamentally alter Georgia's mental health programs. The Georgia federal district court granted a partial summary judgment for the plaintiffs, finding a violation of the integration mandate. The Eleventh Circuit affirmed in part, but reversed because the district court's ruling left state officials no room to put on their fundamental alteration defense. The Supreme Court affirmed that a violation of the integration mandate occurred, but held that the Eleventh Circuit's

formulation of the fundamental alteration defense was still too restrictive. (*Olmstead, supra,* 527 U.S. at pp. 603-606 [119 S.Ct. at pp. 2188-2190].)[9]

The state contended that its decisions were based on a lack of funding and were not by reason of the plaintiffs' disabilities. It also contended the plaintiffs could not prove discrimination because they were not treated differently than were other similarly situated persons. The Supreme Court rejected the latter contention, opting for a "more comprehensive view of the concept of discrimination advanced in the ADA." (*Olmstead, supra,* 527 U.S. at p. 598 [119 S.Ct. at p. 2186], fn. omitted.)

In discussing the integration mandate of section 35.130(d), the *Olmstead* court said the regulation reflected the Attorney General's conclusion "that unjustified placement or retention of persons in institutions, severely limiting their exposure to the outside community, constitutes a form of discrimination based on disability prohibited by Title II." (*Olmstead, supra,* 527 U.S. at p. 596 [119 S.Ct. at p. 2185].) Recounting earlier congressional efforts to protect the disabled, the court said "[t]he ADA stepped up earlier measures to secure opportunities for people with developmental disabilities to enjoy the benefits of community living," noting how one measure stated that the treatment and services offered the disabled " 'should be provided in the setting that is least restrictive of the person's personal liberty.' " (*Id.* at p. 599 [119 S.Ct. at p. 2186], italics omitted.) When enacting the ADA, "Congress explicitly identified unjustified 'segregation' of persons with disabilities as a 'for[m] of discrimination.' " (*Id.* at p. 600 [119 S.Ct. at p. 2187], citing 42 U.S.C. § 12101(a)(2), (5).)

Recognizing that "unjustified institutional isolation" of the disabled is a form of discrimination reflects two evident judgments, according to *Olmstead.* "First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life. [Citations.] Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." (*Olmstead, supra,* 527 U.S. at pp. 600-601 [119 S.Ct. at p. 2187].)

*Helen L.* spoke in similar terms of the evils that arose from institutionalizing disabled persons who could be adequately cared for at home or in a

---

[9]Only four justices joined in the portion of the decision defining the parameters and application of the state's fundamental alteration defense, with two others concurring in only that portion of the judgment.

community placement setting. The plaintiff there was a physically disabled woman receiving state-funded care in a Pennsylvania nursing home. The parties conceded plaintiff was an appropriate candidate for the state's home care program, but the state would not provide those services due to an asserted lack of funding. The federal district court granted summary judgment for the state, finding that because the state's decision was prompted by a lack of funds, it had not discriminated against the plaintiff because of her disability. The Third Circuit reversed and ordered entry of summary judgment for the plaintiff, holding that the state's fundamental alteration defense failed as a matter of law. (*Helen L., supra,* 46 F.3d at pp. 337-339.)

In reaching its holding, the Third Circuit traced the legislative history of the ADA, quoting congressional findings which formed the "backdrop" of the ADA: " '[T]here is a compelling need to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities *and for the integration of persons with disabilities into the economic and social mainstream* of American life.' " (*Helen L., supra,* 46 F.3d at p. 331, original italics.) The integration mandate was enacted by the United States Attorney General to implement the ADA's stated purposes of assuring " 'equality of opportunity, full participation, independent living, and economic self-sufficiency' " for the disabled. (*Id.* at pp. 332-333, italics omitted, quoting 42 U.S.C. § 12101(a)(8).) "Thus, the ADA and its attendant regulations clearly define unnecessary segregation as a form of illegal discrimination against the disabled." (46 F.3d at p. 333, fn. omitted.)

 Based on the various sources quoted above, the integration mandate seems designed to ensure that disabled persons are not shunted aside, ignored, or segregated from society but are instead placed for treatment with the most possible community access, taking into account their treatment needs. We need not and do not determine what constitutes "integration" under section 35.130(d), however. Instead, we reach only the issue of what is not within the scope of that regulation. Nothing in the ADA, its regulations, or the decisions applying the integration mandate appears aimed at the core allegations of appellant's ADA-based cause of action—where the institutionalized decedent was not suited for community care and the State transferred him to such a setting simply because there were no other placement alternatives available.[10]

Appellant recognizes the limiting nature of the fact situations present in cases such as *Olmstead* and *Helen L.,* but contends application of the

---

[10]Our conclusion is not affected by allegations that the State misled appellant about the nature of the placement. We wish to make clear, however, that we do not condone the State's alleged conduct, which, if true, may be actionable under other theories. Our task is to determine whether the placement decision that occurred here, for the reasons alleged, was unlawful discrimination under the ADA.

integration mandate goes beyond their circumstances because the remedial nature of the ADA calls for a far more expansive reading. In appellant's view, the integration mandate is comprised of two independent prongs. First, the disabled must be placed in the most integrated setting. Second, that placement must be consistent with their treatment needs. This purported second prong requires that disabled persons receive proper care and treatment at all times, since the failure to do so may impede their eventual placement in a more integrated setting. Therefore, a violation of the appropriate treatment prong, in and of itself, violates the integration mandate of section 35.130 (d), appellant contends.[11]

Appellant bases his position in part on certain language from *Olmstead* and in part on the decision in *Cable v. Department of Developmental Services* (C.D.Cal. 1997) 973 F.Supp. 937 (hereafter *Cable*). Respondent apparently concedes appellant's interpretation of these decisions but insists this case is distinguishable. As set forth below, we reject appellant's interpretation of *Olmstead* and *Cable*.

 In *Olmstead,* after holding that the failure to provide community-care placements to the plaintiffs who qualified for such placements violated the integration mandate, the court said: "We emphasize that nothing in the ADA or its implementing regulations condones termination of institutional settings for persons unable to handle or benefit from community settings. Title II provides only that 'qualified individual[s] with a disability' may not 'be subjected to discrimination.' " (*Olmstead, supra,* 527 U.S. at pp. 601-602 [119 S.Ct. at pp. 2187-2188], citing 42 U.S.C. § 12132.) Under the ADA, qualified individuals are disabled persons who " '. . . mee[t] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.' [42 U.S.C. § 12131(2).] [¶] Consistent with these provisions, the State generally may rely on the reasonable assessments of its own professionals in determining whether an individual 'meets the essential eligibility requirements' for habilitation in a community-based program. Absent such qualification, it would be inappropriate to remove a patient from the more restrictive setting. See 28 CFR § 35.130(d) (1998) (public entity shall administer services and programs in 'the most integrated setting *appropriate* to the needs of qualified individuals with disabilities' (emphasis added)); [citations.] Nor is there any federal requirement that community-based treatment be imposed on patients who do

---

[11]As appellant admits in his supplemental reply brief, he alleges "the integration mandate was violated [because decedent] was transferred to a setting that was less integrated because La Casa was not a facility that could meet [decedent's] treatment needs. Therefore, while it may have been 'more integrated' in the sense that it was more 'community like' it failed to meet the second prong of the integration mandate because it was not the most integrated setting <u>consistent with decedent's medical needs</u>." (Original underscoring.)

not desire it. [Citation.] In this case, however, there is no genuine dispute concerning the [plaintiffs'] status . . . as individuals 'qualified' for noninstitutional care: The State's own professionals determined that community-based treatment would be appropriate for [plaintiffs], and neither woman opposed such treatment." (*Id.* at pp. 602-603 [119 S.Ct. at p. 2188], fn. omitted.)

■■■■ Appellant extracts the following from this: that the ADA requires appropriate care, based upon the professional judgment of state treatment professionals;[12] that placing a disabled person in community care who can not handle such treatment violates the ADA; that he, as decedent's conservator, would have opposed the transfer from Camarillo to La Casa had he known the true facts; and that as a result the State violated the integration mandate. In drawing this conclusion, appellant has not just ignored the terms of the integration mandate and the Attorney General's explanatory preamble, as set forth above. He has also misread *Olmstead.*

Justice Thomas's dissent in *Olmstead* complained that the majority's holding did not attack discrimination but instead imposed "a standard of care" which "determines that discrimination occurs merely because that individual does not receive the treatment he wishes to receive." (*Olmstead, supra,* 527 U.S. 581, 624 [119 S.Ct. 2176, 2198] (dis. opn. of Thomas, J.). In reply, the majority made clear it did not "hold that the ADA imposes on the States a 'standard of care' for whatever medical services they render, or that the ADA requires States to 'provide a certain level of benefits to individuals with disabilities.' [Citation.] We do hold, however, that States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide." (*Id.* at p. 603, fn. 14 [119 S.Ct. at p. 2188].)

In this light, we interpret *Olmstead* as follows. If a disabled person is not a suitable candidate for treatment in a more integrated setting, it would be inappropriate to transfer the disabled person there. If an assessment by the state's own treatment professionals does not indicate that a disabled person can be properly treated in a more integrated setting, then that disabled person is not eligible for the state's more integrated services and the antidiscrimination protections of the ADA are not triggered. (§ 35.130(d).) The State is generally free to rely on such assessments if they are reasonable. Therefore, when the *Olmstead* court said the ADA does not condone transferring to community placement an institutionalized disabled person who will not

---

[12]Appellant also relies on inapplicable due process decisions holding that the states may rely on a professional's *medical judgment when deciding to involuntarily institutionalize* persons. (See *Youngberg v. Romeo* (1982) 457 U.S. 307 [102 S.Ct. 2452, 73 L.Ed.2d 28].) Due process analysis is not applicable to ADA integration mandate claims. (*Helen L., supra,* 46 F.3d at pp. 333-334.)

benefit from such a placement, we do not believe it was either holding or signaling that a medically inappropriate transfer from institutionalization to community placement is, by itself, a violation of the integration mandate. It was, instead, merely identifying the outer limits of a state's duties under the integration mandate, not establishing new ones.

At bottom, however, appellant's cause of action is based on allegations that the State provided decedent inappropriate care due to a lack of other alternatives. While it might have been medically improper to do so, the State did not violate the integration mandate. (See *Jeffrey v. St. Clair* (D. Hawaii 1996) 933 F.Supp. 963, 970 [state hospital patients were transferred from less restrictive to more restrictive environment when building they occupied had to be shut down, alleging this interfered with their eventual chances for release; preliminary injunction denied because plaintiffs failed to show discrimination by reason of their disability and because the integration mandate did not apply].)

The other primary basis for appellant's position comes from *Cable, supra,* 973 F.Supp. 937. The plaintiff in *Cable* was the medical chief of staff at Fairview Developmental Center. He sued California's Department of Developmental Services, alleging he suffered unlawful retaliation because he protested certain actions which violated the ADA. (42 U.S.C. § 12203(a).)

In order to prove his claim, the plaintiff in *Cable* had to show that the actions he protested were in fact ADA violations. He alleged that the State's legislative policy called for "mainstreaming" the developmentally disabled from hospitals to "natural community settings."[13] Under the terms of a class action settlement,[14] the State was obliged to reduce by one-third the population of its developmental centers within five years. In doing so, plaintiff alleged, the State chose the most severely developmentally disabled persons for community placement because they were either unable to object to the placement or did not have parents or guardians to object on their behalf. Pointing to studies that showed a higher death rate among disabled persons placed in community settings, plaintiff also alleged that many of the community facilities where those patients were placed were unable to adequately care for the patients.

The court denied the State's motion to dismiss, finding that plaintiff alleged discrimination based on the transferred patients' severity of disability. We have no quarrel with this portion of the *Cable* decision. As that court

[13]As appellant correctly points out, various statutes reflect that this is so. (Welf. & Inst. Code, §§ 4502, subd. (a), 5325.1, subd. (a), 5358, subd. (c)(1), 5585.53.)

[14]*Coffelt v. Department of Developmental Services* (Super. Ct. S.F. City and County, 1991, No. 916401).

noted, the plaintiff alleged active discrimination against persons based on the severity of their disabilities in order to foist upon them an inadequate level of care. Discrimination among groups of disabled persons is actionable under the ADA. (*Helen L.*, *supra*, 46 F.3d at pp. 335-336.)

We part company with the *Cable* court in regard to a separate holding—that the inadequate provision of services by itself also violated the integration mandate. The plaintiff alleged he opposed the State's community placement program because it failed to adequately account for the individual needs of patients in making community placement decisions. Rejecting the State's contention that the ADA applied only to discriminatory conduct, the court held, "Title II [of the ADA] requires public entities to administer services in the 'most integrated setting appropriate' regardless of whether that setting is an institution or a community home." The failure to appropriately place the patients therefore violated the integration mandate. (*Cable*, *supra*, 973 F.Supp. at p. 941.)

Not only was this holding dicta, it was reached without discussion, analysis, or consideration of the United States Attorney General's explanatory preamble to the integration mandate or of Congress's findings and expressed purposes in enacting the ADA. If the mere failure to provide an appropriate treatment setting is enough to violate the integration mandate, that would effectively delete the phrase "most integrated setting" from section 35.130(d), changing it to state that public entities "shall administer services, programs, and activities in the . . . setting appropriate to the needs of qualified [disabled persons]." This renders the phrase "most integrated setting" in section 35.130(d) surplusage while creating the absurd result of converting an incorrect treatment decision into discriminatory conduct which is actionable under the ADA. The rules of statutory interpretation forbid such a result. (*Pacific Mut. Life Ins. Co. v. Am. Guar. Life Ins.*, *supra*, 722 F.2d at p. 1500.) Further, it is contrary to *Olmstead*'s later clarification that the integration mandate does not impose a standard of care requirement on the states, which are instead obligated to abide by the ADA's nondiscrimination requirements when administering the services they provide. (*Olmstead*, *supra*, 527 U.S. at p. 603, fn. 14 [119 S.Ct. at p. 2188].)

We think *Cable*'s holding on the appropriateness of the treatment provided is best viewed in the context of the plaintiff's other allegations—that the state was intentionally discriminating against the severely disabled, who were unable to object, by transferring them to community placements where they would receive inappropriate care. Appellant does not address this portion of the *Cable* decision and does not contend his complaint could be amended to allege such facts. Instead, he relies solely on the portion of the

decision that holds that an inappropriate treatment placement by itself violates the integration mandate. For the reasons set forth above, we decline to follow *Cable* in that regard. (*Tully v. World Savings & Loan Assn.* (1997) 56 Cal.App.4th 654, 663 [65 Cal.Rptr.2d 545] [although decisions of lower federal courts are persuasive, we are not obliged to follow them].)

Appellant makes a few final contentions to support his integration mandate claim: (1) the decisions in *North Bay Regional Center v. Sherry S.* (1989) 207 Cal.App.3d 449 [256 Cal.Rptr. 129], and *In re Borgogna* (1981) 121 Cal.App.3d 937 [175 Cal.Rptr. 588], show decedent's right to remain institutionalized; (2) language from *Lelsz v. Kavanagh* (5th Cir. 1987) 807 F.2d 1243, 1255, casts doubt on whether La Casa was in fact a more integrated setting; and (3) unlawful isolation under the integration mandate occurred because decedent was unable to see his family after the transfer to La Casa. We take each in turn.

*North Bay* concerned whether there was a gap in the statutes governing state hospital admissions for severely developmentally disabled adults who were not represented by a conservator, parent or guardian. If such a gap existed, the court noted, it might raise constitutional equal protection concerns. (*North Bay Regional Center v. Sherry S.*, *supra*, 207 Cal.App.3d at p. 456.) *In re Borgogna* concerned a developmentally disabled adult who, along with his parents, resisted his transfer from a state hospital to a community placement. Because the applicable statutory scheme permitted the patient to choose and because the patient was competent to do so, his choice governed. (*In re Borgogna*, *supra*, 121 Cal.App.3d at pp. 947-949, citing Welf. & Inst. Code, § 4741.) Neither has any bearing on the ADA and its integration mandate.

*Lelsz* concerned the federal district court's power to enforce a consent decree from a 1974 Texas class action seeking to place mentally retarded students in the least restrictive alternative. When interpreting the consent decree's terms, the court stated in a footnote that the term "least restrictive alternative" was controversial because some studies indicated community treatment settings were sometimes found lacking compared to institutions which had wheelchair-accessible educational, recreational, living, and shopping facilities. (*Lelsz v. Kavanagh*, *supra*, 807 F.2d at p. 1254, fn. 15.) This observational aside is also inapplicable to our inquiry.

Appellant also suggests that La Casa was not more integrated because decedent lacked the opportunity to "mingle or meet" with nondisabled persons apart from La Casa's staff. Assuming for discussion's sake that La Casa was therefore no more integrated than a state hospital only serves to

reinforce our conclusion since appellant admits his ADA claim is based on the quality of treatment, not on decedent's opportunity to interact with the nondisabled.

Appellant's final contention merits little discussion, since the "isolation" to be countered by the integration mandate is based on the segregation of disabled persons from community services and activities. (*Olmstead, supra,* 527 U.S. at p. 600 [119 S.Ct. at p. 2187] [prevention of unjustified isolation by the integration mandate is aimed at unwarranted assumptions that the disabled are incapable or unworthy of participating in community life].)

### Disposition

For the reasons set forth above, we affirm the judgment. Respondents to recover their costs on appeal.

Turner, P. J., and Grignon, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 10, 2001.