[No. B165538. Second Dist., Div. Eight. June 10, 2004.]

RALPH McLAUGHLIN et al., Plaintiffs and Respondents, v.
WALNUT PROPERTIES, INC. et al., Defendants and Appellants.

**COUNSEL**

Max Craig Cassing for Defendants and Appellants.

Williams, Jordan & Brodersen, Ralph B. Jordan; Cummins & White and James A. Hayes for Plaintiffs and Respondents.

## OPINION

**RUBIN, Acting P. J.**—Defendants Walnut Properties, Inc., the Estate of George Tate, and the George Tate Trust, appeal from the judgment entered in favor of plaintiffs Ralph McLaughlin and Nancy McLaughlin in their action for breach of two commercial ground leases. For the reasons set forth below, we affirm the judgment.

### FACTS AND PROCEDURAL HISTORY[1]

Ralph and Nancy McLaughlin (the McLaughlins) owned two adjacent parcels of land (the land) in Porterville. In 1992, Walnut Properties, Inc. (Walnut) entered into separate 20-year ground leases of those parcels in order to build a multiscreen movie theater on the land. Both leases were guaranteed by George Tate. The combined monthly rent on the leases was $22,500. By March 1994, Walnut was behind in the rent, prompting the McLaughlins to sue. In April 1994, Walnut signed a stipulated judgment for $250,000 in back rent and paid the McLaughlins $150,000 of that amount by June 1994.

In June 1994, Tate and Walnut filed chapter 11 bankruptcy actions, which were converted to chapter 7 actions in August 1994.[2] After that time, Barry Hartsfeld of Walnut assured the McLaughlins that Walnut intended to move forward with the theater project and planned to dismiss the bankruptcy cases. Tate died in 1995.[3] The bankruptcy cases were dismissed in February 1996. Over the next two years, Walnut took various actions to keep the project going: Walnut sought a bank loan to continue with the project, and submitted to the bank documents that listed the ground leases as an ongoing expense item; it proposed an installment plan to pay off nearly $1 million in unpaid rent; Walnut met with Porterville city officials several times to discuss the project and submitted construction plans for the city's approval; Walnut involved Ralph McLaughlin in those discussions; and in June 1997 Walnut gave the McLaughlins a $50,000 check from the George Tate Trust as partial payment for the unpaid rent.

By December 1997, however, the McLaughlins had not been paid in six months and the rent arrearages remained unpaid. They then sued Walnut and

---

[1] Part of this appeal arises from a pretrial order for summary adjudication that struck an affirmative defense. The facts surrounding that motion are undisputed. Apart from those facts, we state the facts of this case in the manner most favorable to the judgment. (*Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 755, fn. 2 [110 Cal.Rptr.2d 861].)

[2] A chapter 7 action provides for the liquidation of a debtor's assets and a chapter 11 action provides for their reorganization. (*Murphy v. Yale Materials Handling Corp.* (1997) 54 Cal.App.4th 619, 621 [62 Cal.Rptr.2d 865].)

[3] After that time, Tate's interests were represented by his estate and his trust. When we refer to Tate, we therefore include those entities where applicable. We will sometimes refer to Walnut and Tate collectively as appellants.

Tate for the unpaid rent.[4] Ralph McLaughlin testified that Walnut was no longer in possession of the land as of March 1998, when Walnut or Tate sent the McLaughlins a letter stating they no longer had an interest in the land. Between April 1996 and April 1998, the McLaughlins made no efforts to find another tenant "because they [Walnut] were involved in the project fully."

Appellants' answer to the McLaughlins' complaint raised an affirmative defense based on a procedural rule of federal bankruptcy law: because appellants' bankruptcy trustee did not elect whether to assume or reject the leases within 60 days, the lease was deemed terminated as of around August 1994, cutting off the McLaughlins' damages as of that time. (11 U.S.C. § 365(d)(4).) The McLaughlins brought a motion for summary adjudication of that affirmative defense, contending that a recently evolved line of cases held that the leases had not terminated, leaving them with their full breach of contract remedies under state law. The trial court agreed, finding under the relatively new line of cases that the lease had merely been breached by the bankruptcy trustee's deemed rejection.

A two-day bench trial was held in July 2002.[5] After hearing from various witnesses and reviewing the leases and other exhibits, the trial court found, by way of minute order, that appellants breached the lease in March 1998 and were liable for damages for three years from that date totaling more than $2.6 million. On December 30, 2002, the court signed and entered a written judgment which simply stated that the McLaughlins "shall have and recover judgment in the sum of $2,643,333, plus interest thereon from March 1, 2001," along with costs and attorney's fees. No statement of decision was requested or rendered. Appellants contend the court erred by rejecting their affirmative defense.

## STANDARD OF REVIEW

■ Since we are construing a federal statute, we must apply and interpret federal law. Decisions of the United States Supreme Court are binding. Lower federal court decisions, including those of the Ninth Circuit Court of Appeal, are not. If federal precedent is either lacking or in conflict, we will independently determine federal law. (*Levy v. Skywalker Sound* (2003) 108 Cal.App.4th 753, 763, fn. 9 [134 Cal.Rptr.2d 138]; *Gervase v. Superior Court* (1995) 31 Cal.App.4th 1218, 1228–1229 [37 Cal.Rptr.2d 875].)

■ The rules of federal statutory interpretation are much the same as those used when construing California statutes. Our primary function is to

---

[4] The action was originally filed in Tulare County but its venue was changed to Los Angeles County in April 1998.

[5] The motion for summary adjudication was decided by Judge Victoria Chaney. The trial was held before Judge Jon M. Mayeda.

give effect to Congress's intent. Unambiguous statutory language is conclusive absent clear proof of a contrary legislative intent. The words of a statute must be construed in context and statutes must be harmonized, both internally and with each other, to the extent possible. Interpretations which would render some terms surplusage, defy common sense or lead to mischief or absurdity are to be avoided. (*Black v. Department of Mental Health* (2000) 83 Cal.App.4th 739, 747–748 [100 Cal.Rptr.2d 39].)

## DISCUSSION

### 1. *Rejection Did Not Terminate the Ground Leases*

■ Under California law, when a lessee breaches a lease and abandons the rented property before the lease term expires, and if the lease so provides, a landlord suing for breach of the lease is entitled to recover unpaid rent up to the time of the judgment and future rent owed under the lease, subject to the lessor's duty to mitigate his damages. (Civ. Code, § 1951.2, subds. (a)(1)–(3), (c)(1); *Walt v. Superior Court* (1992) 8 Cal.App.4th 1667, 1671–1672 [11 Cal.Rptr.2d 278].) The ground leases contain such provisions. The trial court found that appellants breached the leases in March 1998. Based on that, the court awarded the McLaughlins damages for unpaid rent from August 1994 through March 1998, and damages for future rent from March 1998 through March 2001.

■ Under federal bankruptcy law, a debtor's bankruptcy trustee must elect whether to assume or reject a lease of commercial property within 60 days. If no election is made, the lease is deemed rejected. (11 U.S.C. § 365(d)(4) (section 365).) Appellants' bankruptcy trustee did not make the election, meaning that the lease was rejected. Some federal decisions have held that the rejection of a lease terminates the lease. Based on those rulings, appellants raised section 365 as an affirmative defense, contending the leases were terminated sometime between August and October 1994 when the deemed rejection occurred, cutting off the McLaughlins' right to recover any damages after that time.

■ The McLaughlins brought a summary adjudication motion as to that defense. The undisputed facts developed by their motion did no more than establish the timing of the leases, and the filing and dismissal of the bankruptcy petitions. The motion was not based on and did not mention appellants' postrejection conduct. Relying on a more recent line of bankruptcy court decisions, the McLaughlins argued that the rejection of a lease under section 365 amounted to a breach and a loss of the right to possession, but did not terminate the lease. Judge Chaney agreed, striking the

affirmative defense. Appellants contend Judge Chaney erred.[6] As set forth below, our analysis of the statute and the applicable case law convinces us that Judge Chaney was correct.

The purpose behind allowing a bankruptcy trustee to assume or reject executory contracts and leases is to let the trustee decide which contracts are beneficial to the debtor's estate and which are not. If continuing a contractual obligation would be too burdensome, then the trustee can reject it. (*In re Park* (Bankr. E.D.Va. 2002) 275 B.R. 253, 255.) Even though the rejection takes place after the bankruptcy action is filed, it is treated as a prepetition claim, leaving the creditor with a viable claim against the debtor. (*In re Lavigne* (2d Cir. 1997) 114 F.3d 379, 387; see Historical and Statutory Notes, 11 U.S.C.A. (2004 ed.) § 365, p. 233 [purpose behind provision setting time at which rejection is treated as breach is to "treat rejection claims as prepetition claims"].)

Section 365(d)(4) states that if the trustee does not assume or reject a lease of nonresidential real property on time, "then such lease is deemed rejected, and the trustee shall immediately surrender [the property] to the lessor." Some bankruptcy court decisions, such as those cited by appellants, have relied on the requirement of surrender of the property to conclude that the deemed rejection of the lease thereby also terminates the lease. (*In re Gillis*

---

[6] Although appellants are challenging an order granting summary adjudication, they have failed to properly brief the procedural aspects of that order. Their statement of facts did not mention the summary adjudication order at all. When it was first mentioned in the argument portion of their brief, they did not include any description or discussion of the legal arguments and facts raised in support of or opposition to that motion and failed to discuss or cite legal authority for the standards by which we review a ruling on summary adjudication. They compounded this error by failing to request certain key documents as part of the record on appeal: the McLaughlins' moving papers, including their points and authorities, separate statement of undisputed fact, and reply papers; and their own opposition separate statement of facts. Moreover, even though they asked to include Judge Chaney's detailed minute order in the record, it was not included and they took no steps to correct the record. Instead, the McLaughlins attached the order as an exhibit to their appellate brief. For all these reasons, we could deem the entire issue waived. (*Dawson v. Toledano* (2003) 109 Cal.App.4th 387, 402 [134 Cal.Rptr.2d 689] [failure to include moving and opposition summary judgment papers in record]; *Pringle v. La Chapelle* (1999) 73 Cal.App.4th 1000, 1003, fn. 2 [87 Cal.Rptr.2d 90] [without proper record, evidence is conclusively presumed to support the judgment]; *Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699–700 [46 Cal.Rptr.2d 119] [failure to discuss or brief legal and factual issues].)

We have augmented the record to include the missing documents, however. Because the issue raised is purely a legal one—the interpretation of a statute based on undisputed facts—we exercise our discretion to disregard appellants' omissions. In doing so, we consider only those matters which were before Judge Chaney and ignore the parties' efforts to have us consider evidence from the trial when considering the propriety of the summary adjudication order. (*Zavala v. Arce* (1997) 58 Cal.App.4th 915, 925–926 [68 Cal.Rptr.2d 571] [when reviewing order granting summary judgment, we examine the record and papers that were before the trial court].)

(Bankr. D.Hawaii 1988) 92 B.R. 461; *In re Bernard* (Bankr. D.Hawaii 1986) 69 B.R. 13; *In re Hawaii Dimensions, Inc.* (Bankr. D.Hawaii 1984) 39 B.R. 606; see also *Syufy Enterprises v. City of Oakland* (2002) 104 Cal.App.4th 869, 880–881 [128 Cal.Rptr.2d 808] (*Syufy*), and cases cited therein.)

However, section 365(g) states, that with exceptions that do not apply here, the rejection of an unexpired lease "constitutes a breach of such . . . lease." (§ 365(g), (h)(2), (i)(2).) Elsewhere in section 365, Congress provided that when the debtor is the lessor, the lessee may treat the lease as being terminated by the rejection if the breach is sufficiently material. (§ 365(h)(1)(A).) Similar provisions also apply to timeshare purchasers. (§ 365(h)(2)(A).) More recent federal cases have seized upon this language to conclude that Congress thereby made a clear distinction between a breach and a termination. According to those courts, section 365 therefore provides that the rejection of a lease in most circumstances is a breach, not a termination. (See *In re Austin Development Co.* (5th Cir. 1994) 19 F.3d 1077 (*Austin*); *In re Locke* (Bankr. C.D.Cal. 1995) 180 B.R. 245 (*Locke*); *In re Tri-Glied, Ltd.* (Bankr. E.D.N.Y. 1995) 179 B.R. 1014 (*Tri-Glied*).)[7] Another factor in the *Austin* line of cases is the effect that termination of the lease would have on third party nondebtors, such as cotenants and secured creditors, by stripping them of their rights in the debtor's leasehold. (*Austin, supra,* at p. 1083; *Locke, supra,* at pp. 261–263.)

California courts have recognized that the *Austin* line of cases represents the emerging view of the federal bankruptcy courts, even in the Ninth Circuit, which had previously held that a lease is terminated by its rejection under section 365. (*Syufy, supra,* 104 Cal.App.4th at pp. 882–883, and cases cited therein; *Vallely Investments, L.P. v. BancAmerica Commercial Corp.* (2001) 88 Cal.App.4th 816, 829–830 [106 Cal.Rptr.2d 689] (*Vallely Investments*), and cases cited therein.) Both courts opted to follow this emerging view. (*Syufy, supra,* at pp. 882–883 [following *Austin* line, held that continuing viability of a sublease was a question of California law]; *Vallely Investments, supra,* at pp. 829–830.)

■ We join the *Syufy* and *Vallely Investments* courts and adopt the emerging view that the rejection of an unexpired lease is no more than a breach and does not terminate the lease. We do so based upon the fairly plain language of section 365, which uses the terms "breach" and "termination" as if they had different meanings and which directly states that except for circumstances not applicable here, the rejection of a lease is a breach. Under the applicable rules of statutory construction, set forth above, we believe Congress meant what it said—a breach is different from a termination, and the rejection of a lease under these circumstances is merely a breach. (*Austin,*

---

[7] For ease of reference, we will refer to such decisions as the *Austin* line of cases.

*supra,* 19 F.3d at pp. 1082–1083.) Under this interpretation, the debtor continues to be liable for postrejection damages, subject to their disposition in the bankruptcy proceeding as prepetition claims. (*In re Lavigne, supra,* 114 F.3d at p. 387.)

■ Appellants rely on *Tri-Glied, supra,* 179 B.R. 1014, to avoid this result. *Tri-Glied* involved the same procedural situation as in this case: the debtor-lessee dismissed its bankruptcy action after the lease was deemed rejected. At issue was the effect of the dismissal on the lease, with the debtor arguing it was completely revived. The New York bankruptcy court disagreed, holding that the surrender requirement of section 365(d)(4) meant that the lessee's right to possession had been lost once the lease was deemed rejected. Even so, under the *Austin* line of cases, the lease had been breached, not terminated. Under the modern concept, leases are viewed as more than just mere conveyances. Instead, a lease is also a bilateral contract with numerous mutual obligations. Although the debtor-lessee might lose its right to possess the leased property, the other contractual obligations survived. (*Id.* at pp. 1022–1023.)

According to appellants, we should disregard the latter conclusion and focus solely on the *Tri-Glied* court's holding that the right of possession was lost upon the deemed rejection of the leases. Having lost the right to possession, they contend, it is clear that the lease was terminated. We disagree. First, the argument simply restates the position taken by the older line of bankruptcy court cases, which is contrary to the emerging view that we have adopted. Under the *Austin* line of cases, Congress made it fairly plain that the rejection of a lease is no more than a breach, which allows the creditor-lessor to claim his breach of contract losses during the bankruptcy proceedings. Second, even though the *Austin* line's policy of protecting the rights of third party nondebtors is not implicated by the facts of this case, nothing in those cases or section 365(d)(4) suggests that the rule should change on a case-by-case basis. Finally, terminating a lease simply because the debtor-lessee has rejected it would allow unscrupulous lessees to evade their contractual obligations by the simple expediency of filing for bankruptcy, then dismissing their petition after the lease had been rejected.

## 2. *Calculation of Damages*

Appellants contend the trial court erred by finding that the lease was breached in March 1998. Instead, according to appellants, because the deemed rejection of the leases meant the leases were terminated as a matter of federal bankruptcy law by October 1994, their liability for past-due rent was cut off as of that time.[8] Because we hold that the lease was not terminated at that time, the argument fails.

■ Appellants also appear to contend that the leases were terminated by October 1994 because there was no evidence to show they ever took possession of the land after filing for bankruptcy in 1994. This argument fails for two reasons. First, under *Tri-Glied, supra,* 179 B.R. at pages 1022–1023, even if appellants lost the right to possession, the lease and its attendant obligations remained in effect. Second, it ignores the evidence supporting the trial court's finding that the lease was finally breached in March 1998, when appellants' possession of the land ceased after sending a letter stating they no longer had an interest in the land. Before discussing that evidence, however, it is important to note that no statement of decision was requested or rendered. As a result, we will imply all findings necessary to support the judgment, so long as those findings are supported by substantial evidence. (*In re Marriage of Condon* (1998) 62 Cal.App.4th 533, 549, fn. 11 [73 Cal.Rptr.2d 33].)

■ The McLaughlins point to all the evidence showing that during the bankruptcy proceedings through March 1998, the appellants assured them that they intended to continue with the project and took steps to do so. As set forth in the statement of facts, these included partial payments of back rent, proposals to pay the remaining unpaid rent, and involving the McLaughlins in discussions with a bank and Porterville city officials about the finances and plans for the project. According to Ralph McLaughlin, he made no efforts to find another tenant because appellants were fully involved in the project. Under federal bankruptcy law, a lessor can waive the debtor-lessee's rejection under section 365(d)(4) through such postrejection conduct as accepting rent. (*In re Lew Mark Cleaners Corp.* (Bankr. E.D.N.Y. 1988) 86 B.R. 331, 335; *In re T.F.P. Resources, Inc.* (Bankr. S.D.N.Y. 1985) 56 B.R. 112, 116.) The two ground leases also provided that the McLaughlins could waive a breach of the lease, but that such waivers would not be deemed continuing and would not waive any later breaches by appellants. Ralph McLaughlin testified that appellants' possession of the land ceased after they sent their March 1998 letter disclaiming any further interest in the land. Implicit in that testimony, of course, is that appellants did exercise a right to possession until that time. Combined with the evidence of their postrejection conduct—which included

---

[8] Appellants do not challenge the court's finding that their future liability under the lease extended for another three years.

the partial payment of rent, further negotiations with the McLaughlins for unpaid rent, their assurances that they intended to continue with the project, and their steps to obtain financing from a bank and project approval from the city—this evidence supports a finding that the McLaughlins waived appellants' breaches of the lease during that period. Under the applicable rules of appellate review, we imply that such a finding was made.

## DISPOSITION

For the reasons set forth above, the judgment is affirmed. Respondents to recover their costs on appeal.

Boland, J., and Flier, J., concurred.