Filed 7/22/15

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| RITA MARSHALL,<br><br>　　Plaintiff and Appellant,<br><br>　　v.<br><br>COUNTY OF SAN DIEGO et al.,<br><br>　　Defendants and Respondents. | D063675<br><br><br><br>(Super. Ct. No.<br>　37-2008-00085115-CU-CR-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Ronald S. Prager, Judge.  Affirmed.

Law Offices of Shawn A. McMillan, Shawn A. McMillan, Stephen D. Daner and Samuel H. Park for Plaintiff and Appellant.

Thomas E. Montgomery, County Counsel and David L. Brodie, Deputy County Counsel for Defendants and Respondents.

I.

INTRODUCTION

Shortly after his birth in 2003, the County of San Diego Health and Human Services Agency (the Agency) placed a dependent child named J.J. with appellant Rita

Marshall.  Marshall cared for J.J. for two and a half years and began the process of adopting him.  However, in June 2006, the Agency commenced proceedings that led to J.J.'s removal from Marshall's care and his placement in another home for adoption.

Marshall filed this action against the County of San Diego (the County) and several County social workers who were involved in the proceedings that led to J.J.'s removal.  In the causes of action relevant to this appeal, Marshall brought two claims pursuant to 42 United States Code section 1983 (hereafter section 1983) against the social workers in which she claimed that the social workers violated her right to due process in removing J.J. without providing her adequate notice and an opportunity to be heard, and in making deliberately false statements to the trial court that led to the removal.  Marshall also brought a section 1983 claim against the County, alleging that the social workers violated her constitutional rights pursuant to a County custom or policy.

In summary judgment proceedings, the trial court concluded that the social workers were entitled to qualified immunity with respect to Marshall's claims against them because there was no evidence from which a reasonable jury could find that the social workers had violated Marshall's "clearly established" constitutional rights. (*Carroll v. Carman* (2014) ___U.S. ___ [135 S.Ct. 348, 350] (*Caroll*).)  ["A government official sued under § 1983 is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct"].)  The court also concluded that the County was entitled to judgment as a matter of law with respect to Marshall's section 1983 claim.

On appeal, Marshall contends that the trial court erred in granting summary judgment for the County and the social workers. With respect to Marshall's claims based on the social workers having purportedly made deliberately false statements to the trial court, we conclude that Marshall had a clearly established constitutional right not to have J.J.'s placement terminated based on a social worker's statement that was either deliberately false or made with reckless disregard for its truth. However, we further conclude that the social workers are entitled to qualified immunity with respect to Marshall's claims premised on this theory of liability because there is no evidence from which a reasonable jury could find that that J.J.'s placement with Marshall was terminated based on statements that were either deliberately false or made with reckless disregard for their truth. We also reject the remainder of Marshall's other claims, and affirm the judgment.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.      *Factual background*

1.      *J.J. is placed in Marshall's Care*

J.J. was born on November 22, 2003. Within days of his birth, the trial court declared J.J. a dependent of the court and the Agency placed him with Marshall.

In June 2004, Marshall informed the Agency that she wanted to adopt J.J. Throughout his placement with Marshall, respondent Noreen Harmelink, the primary social worker assigned to J.J., reported to the trial court that J.J. was doing well in Marshall's home.

3

2.    *Marshall initiates the adoption process for J.J.*

The court terminated the parental rights of J.J.'s birth parents in May 2005, and, in November 2005, entered an order setting adoption as J.J.'s permanent plan. In December 2005, the Agency received forms from Marshall requesting to initiate the adoption process for J.J.

Agency adoptions applicant worker Elizabeth Edwards met with Marshall in March 2006 to begin the adoption homestudy process. Edwards gave Marshall forms to fill out and return, including the formal "Application to Adopt" form. Marshall never returned the forms.

3.    *The Agency seeks to remove J.J. from Marshall's home*

On June 19, 2006, respondent Linda Johanesen, the Agency social worker for two other children placed in Marshall's home, K.B. and C.B., verbally informed Marshall that the Agency was planning to remove K.B., C.B. and J.J. from Marshall's home. On June 26, Marshall filed an objection to the Agency's proposal to remove J.J. with the trial court.[1] Marshall also requested that the court formally designate her as J.J.'s prospective adoptive parent.

---

[1]    Marshall's objection was marked "received" by the court on June 26, but was not stamped "filed" until July 12.

4

Johanesen and her supervisor, respondent Robin Thompson, filed an ex parte application on June 28, 2006 to remove J.J. from Marshall's home.[2] The June 28 ex parte application stated in relevant part:

> "The Agency received two recent CPS [Child Protective Services] referrals on the [Marshall] home for physical discipline. Currently, there are 11 total referrals and have been 11 holds placed on this home. This home is currently on hold. [Marshall] has not complied with requests for the adoptive homestudy and her homestudy has been closed as unapproved.

> "Recent psychological evaluations recently performed on two other children in this home recommend that the caregiver's [*sic*] received [*sic*] psychoeducation to develop appropriate discipline strategies. It is the Agency's position that [Marshall] will not comply with the recommendation since she has not complied with the requirements for the adoptive homestudy. Attached is the Addendum Report for [C.B.] and [K.B.] who also reside in this home. . . . The Agency is asking to remove these children also. [Marshall] has been given the proper [statutory] notice. [Marshall] has made no attempt to contest the children's removal."

That same day, June 28, the trial court granted the application and vacated J.J.'s placement with Marshall, effective that day.[3]

4.    *The July 20 hearing*

The trial court held a hearing on July 20 on Marshall's objection to the removal and request to be designated J.J.'s prospective adoptive parent. Just before the hearing began, Harmelink gave Marshall a copy of a July 20 addendum report that outlined the

---

[2]    Harmelink was on vacation at the time the ex parte application was filed.

[3]    J.J. was not actually removed from Marshall's home until October 6, 2006.

reasons for the Agency's request that the court reaffirm its decision to vacate J.J.'s placement with Marshall.

In the report, in support of its removal recommendation, the Agency noted that there had been a recent referral alleging physical abuse on a child in Marshall's home, and that there had been 11 different child abuse referrals since 2001, which had resulted in 11 different "holds" on Marshall's home. The report also stated that Marshall "typically maintains six [foster] children in her care," that the children were often young and with special needs, and that Marshall "works full time." The report stated that Marshall appeared to be "stretched beyond her capability to be physically and emotionally available to the children in the manner one would anticipate from an adopting caregiver." The Agency also noted that K.B. and C.B. had recently undergone psychological evaluations, and that the psychologist had "expressed concerns regarding the care these children have received in [Marshall's] home." The report also stated that Marshall had failed to follow through with the adoptive homestudy process with J.J.

The trial court briefly adjourned the hearing in order to give Marshall time to read the addendum report. After the brief recess, the court resumed the hearing. At the conclusion of the hearing, the court entered an order overruling Marshall's objection to the removal. The court also rejected Marshall's request to be designated J.J.'s prospective adoptive parent.

6

5.    *Additional proceedings*

Marshall filed a writ petition in this court seeking review of the July 20 order. While Marshall's writ petition was pending, the Agency removed J.J. from Marshall's home and placed him in a new home.

On October 25, 2006, this court issued an opinion vacating the trial court's July 20 order. (*Rita M. v. Superior Court* (Oct. 25, 2006, D049099) [nonpub. opn.] (*Rita M. I*).) The court concluded that Marshall was "not provided sufficient notice that J.J. would be removed and [Marshall] would not be approved to adopt him" (*ibid.*), and ordered that Marshall be provided a new hearing "where she will have an adequate opportunity to address the Agency's concerns about her care of J.J." (*Ibid.*) Apparently unaware that the Agency had removed J.J. from Marshall's home between the time Marshall filed her writ petition and the time of oral argument on the petition,[4] this court stated, "No change of J.J.'s current placement is required pending this hearing." (*Ibid.*)

On remand, approximately seven months later, the trial court held a new hearing and concluded that removing J.J. from his new adoptive home would not be in his best interest.[5] Marshall filed a second writ petition in which she contended that

_____

4    In opposing respondents' motion for summary judgment, Marshall offered the declaration of the attorney who represented her in her appeal from the July 20 order. The attorney stated that he recalled County counsel informing this court at oral argument that J.J. was still living with Marshall.

5    Marshall stated in her declaration that the hearing on remand was delayed "due to a number of continuances."

7

the trial court erred in failing to place J.J. in her home for adoption. This court denied Marshall's petition. (*Rita M. v. Superior Court* (Sept. 21, 2007, D051025) [nonpub. opn.] (*Rita M. II*).)

B.     *Procedural history*

1.     *The complaint*

Marshall filed a complaint in June 2008 against the County and various County social workers, including Thompson, Johanesen, and Harmelink (we refer to Thompson, Johanesen, and Harmelink collectively as "the social workers").[6]

As relevant to this appeal, Marshall brought claims pursuant to section 1983 against both the social workers and the County.[7] Marshall's claims against the social workers alleged violations of her right to due process (third cause of action) and her due process right to familial association (fourth cause of action). Both causes of action against the social workers are premised on two sets of purported constitutional violations. First, Marshall claims that the social workers violated her constitutional rights by "removing . . . J.J. from the care, custody, and control of his identified prospective adoptive parent, [Marshall], without exigent circumstances, and without providing

---

[6]     Marshall's complaint also named several additional County social workers as defendants. However, those defendants are not respondents in this appeal.

[7]     "Section 1983 provides a cause of action against state actors who violate an individual's rights under federal law." (*Filarsky v. Delia* (2012) ___ U.S. ___ [132 S.Ct. 1657, 1660].) In addition, "when execution of a government's policy or custom . . . inflicts the injury . . . the government as an entity is responsible under [section] 1983." (*Monell v. Department of Social Services* (1978) 436 U.S. 658, 694 (*Monell*).)

adequate notice or an opportunity to be heard . . . ."[8]  Second, Marshall contends that the social workers violated her constitutional rights by "using false and fabricated evidence and testimony . . . during the pendency of the dependency proceedings . . . ."[9]

With respect to the County, Marshall claimed that the social workers committed violations of her constitutional rights pursuant to a County policy or custom.

2. *Respondents' first motion for summary judgment and/or adjudication*

Respondents filed a motion for summary judgment and/or adjudication in March 2012.  With respect to Marshall's judicial deception theory of liability, the trial court ruled that Marshall had presented sufficient evidence from which a jury could find that the social workers had violated her due process right to be free from judicial deception with respect to statements made in the June 28 ex parte application.  However, the court concluded that the social workers were entitled to qualified immunity as to this theory of liability on the ground that Marshall's right to be free from judicial deception was not clearly established at the time the social workers acted.

With respect to Marshall's notice theory of liability, the trial court ruled that Marshall had a clearly established right to notice and a full hearing before J.J.'s placement with her could be terminated, and that there was a triable issue of fact with respect to whether the social workers had provided Marshall with adequate notice of the June 28 ex parte hearing.  Accordingly, the court ruled that the social workers were not

---

[8]  For ease of reference, we refer to this as the "notice" theory of liability.

[9]  For ease of reference, we refer to this as the "judicial deception" theory of liability.

9

entitled to judgment as a matter of law on their qualified immunity defense with respect to Marshall's notice theory of liability.

The court denied respondents' motion with respect to Marshall's claim against the County on the ground that the only evidence of the County's policies and customs was a declaration of a County employee who lacked the knowledge necessary to make the statements set forth in the declaration.

3.      *County's motion for summary adjudication*

The court permitted the County to file a second motion for summary adjudication of the section 1983 unlawful policies claim against it.  The court reasoned in part that the denial of the first motion was based entirely on the fact that the County had supported its motion with a declaration from "the wrong person," and that permitting a successive motion had the potential to obviate a lengthy trial.

The County filed a motion for summary adjudication on the unlawful practices claim in August 2012.  The Court granted the motion, reasoning that Marshall had failed to show that any of her alleged constitutional violations were caused by a County custom or policy.

4.      *The social workers' motion for summary judgment*

The social workers filed a request for authorization to file an additional motion for summary judgment with respect to Marshall's notice theory of liability in November 2012.  In support of this request, the social workers contended that they had provided the required statutory notice and that this issue had not been addressed in the prior motion. The court permitted the social workers to file the new motion for summary judgment.

10

The social workers filed a motion for summary judgment on Marshall's notice theory of liability in December 2012. In their motion, the social workers contended that it was undisputed that Johanesen had provided Marshall with oral notice of the Agency's intent to remove J.J. from Marshall nine days prior to Thompson and Johanesen's filing of the June 28, 2006 ex parte application and that they were entitled to qualified immunity for any deficiencies in the adequacy of the notice. The court granted the motion, ruling that a reasonable social worker would not have known that she was violating Marshall's due process rights.

5.      *The final judgment and appeal*

The trial court entered a final judgment in favor of respondents in January 2013, from which Marshall timely appealed.

III.

DISCUSSION

A.      *The trial court had inherent authority to entertain successive motions for summary judgment and/or adjudication*

Marshall contends that the trial court erred in permitting respondents to file successive motions for summary judgment and/or adjudication. Citing *Le Francois v. Goel* (2005) 35 Cal.4th 1094, 1109 (*Le Francois*), Marshall contends that "[a] trial court lacks authority to grant a repetitive motion, where the requirements of [Code of Civil Procedure] section 437c[, subdivision] (f)(2) are not satisfied." Marshall's contention raises a question of law, which we review de novo. (See *People v. Lujan* (2012) 211 Cal.App.4th 1499, 1507 [determining whether a trial court has the inherent authority to

11

take an action is reviewed de novo]; *City of Dana Point v. California Coastal Commission* (2013) 217 Cal.App.4th 170, 187 [claims raising an issue of statutory interpretation are reviewed de novo].)

1.      *Governing law*

Code of Civil Procedure section 437c, subdivision (f)(2) provides:

> "A motion for summary adjudication may be made by itself or as an alternative to a motion for summary judgment and shall proceed in all procedural respects as a motion for summary judgment. However, a party may not move for summary judgment based on issues asserted in a prior motion for summary adjudication and denied by the court, unless that party establishes to the satisfaction of the court, newly discovered facts or circumstances or a change of law supporting the issues reasserted in the summary judgment motion."

In *Le Francois, supra*, 35 Cal.4th at pages 1096-1097, the Supreme Court concluded that "[Code of Civil Procedure] section[] 437c, subdivision (f)(2) . . . prohibit[s] a *party* from making renewed motions not based on new facts or law, but do[es] not limit a *court's* ability to reconsider its previous interim orders on its own motion, as long as it gives the parties notice that it may do so and a reasonable opportunity to litigate the question."  The *Le Francois* court agreed with a "line of cases . . . which holds that [Code of Civil Procedure] section[] 437c . . . validly limit[s] the *parties'* ability to make repetitive motions but do[es] not limit the *court's* authority to act on its own motion."  (*Le Francois, supra,* at p. 1103.)  The *Le Francois* court reasoned, "On its face, [Code of Civil Procedure, section 437c, subdivision (f)(2)] merely says that 'a *party* may not' make a motion that violates its provisions.  (Italics added.)  It says nothing limiting the *court's* ability to act."  (*Le Francois*, *supra*, at p. 1105.)

12

## 2. *Application*

Marshall contends that the trial court has inherent authority under *Le Francois* only to correct its *own errors*, and that *Le Francois* does not permit a trial court to allow a party to file "repetitive motions" for summary judgment and/or adjudication. We do not read *Le Francois* so narrowly. The *Le Francois* court noted that the text of Code of Civil Procedure section 437c, subdivision (f)(2) restricts only a party's ability to file a motion, and does not restrict a court's inherent authority in any manner. (*Le Francois, supra*, 35 Cal.4th at p. 1105.) In addition, to interpret Code of Civil Procedure section 437c, subdivision (f)(2) as prohibiting a court from allowing a party to file a successive summary judgment or adjudication motion would raise the "difficult constitutional question[]" (*Le Francois*, *supra*, at p. 1105) of whether the Legislature may restrict a court's authority in such a fashion. (See *id.* at p. 1104 [noting that the court's interpretation of Code Civ. Proc., § 437c, subd. (f)(2) as restricting only parties' acts obviated the need to consider whether it would be constitutional for the Legislature to "limit the court's ability to reconsider its own rulings"].) In contrast, interpreting Code of Civil Procedure section 437c, subdivision (f)(2) as permitting a trial court to exercise its inherent authority to permit a party to file a successive motion for summary judgment and/or adjudication is both consistent with the *Le Francois* court's interpretation of the statute and avoids this difficult constitutional question. (See *Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 846-847 ["An established rule of statutory construction requires us to construe statutes to avoid 'constitutional infirmit[ies]' "]; accord *Le Francois*, *supra*, at p. 1105, citing *Myers*.)

13

Marshall also contends that the trial court's authority was limited to "grant[ing] reconsideration of its own motion . . . *based on the evidence originally submitted*." (Quoting *In re Marriage of Barthold* (2008) 158 Cal.App.4th 1301, 1314 (*Barthold*), italics in original.) In *Barthold*, the Court of Appeal applied *Le Francois* and concluded "that the trial court's inherent authority to correct its errors applies even when the trial court was prompted to reconsider its prior ruling by a motion filed in violation of [Code of Civil Procedure] section 1008." (*Barthold, supra*, at pp. 1303-1304.) In rejecting a party's contention that such a holding would encourage the filing of unwarranted motions for reconsideration, the *Barthold* court stated, "[W]e stress that in order to grant reconsideration on its own motion, the trial court must conclude that its earlier ruling was wrong, and change that ruling *based on the evidence originally submitted*." (*Id*. at p. 1314.)

*Barthold* does not preclude the trial court's action in this case. The *Barthold* court was discussing a trial court's authority to grant *reconsideration* of a prior order based on a motion filed in violation of Code of Civil Procedure section 1008. In contrast, in this case, the trial court did not *reconsider* a prior order. It permitted respondents to file new motions for summary judgment and/or adjudication. Thus, even assuming that the *Barthold* court was correct in its statement that a trial court may grant *reconsideration* of a prior order on its own motion based only on the evidence originally submitted,[10] neither *Barthold* nor *Le Francois* limits a trial court's authority to permit a party to file a

_____

[10]    The *Barthold* court did not cite any portion of *Le Francois* for this proposition, or any other authority.

14

successive motion for summary judgment and/or adjudication supported by evidence that was not presented in connection with a prior motion.

Accordingly, we conclude that the trial court did not err in permitting respondents to file successive motions for summary judgment and/or adjudication.

B.      *The trial court did not err in granting summary judgment in favor of respondents*

Marshall claims that the trial court erred in granting summary judgment in favor of respondents. Specifically, Marshall contends that the trial court erred in granting judgment as a matter of law for the social workers on her section 1983 claims against them. Marshall also argues that the trial court erred in granting judgment as a matter of law for the County on Marshall's section 1983 claim asserted against the County.

1.      *Relevant summary judgment law*

A moving party is entitled to summary judgment when the party establishes that it is entitled to the entry of judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant may make this showing by demonstrating that the plaintiff cannot establish one or more elements of all of his causes of action, or that the defendant has a complete defense to each cause of action. (*Id*., subd. (o).) This court reviews an order granting a motion for summary judgment de novo. (See, e.g., *Jones v. Wachovia Bank* (2014) 230 Cal.App.4th 935, 945.) "We will affirm a summary judgment if it is correct on any ground, as we review the judgment, not its rationale." (*Overstock.com, Inc. v. Goldman Sachs & Co.* (2014) 231 Cal.App.4th 513, 528, fn. 10.)

15

2.      *The social workers are entitled to qualified immunity as matter of law on Marshall's claims premised on their purported failure to provide her with notice and a full hearing before the termination of J.J.'s adoptive placement*

   a.      *Marshall's claims*

Marshall's section 1983 claims against Thompson and Johanesen are based in part on her allegation that they "failed to provide notice reasonably calculated to apprise [Marshall] of the location, date, and time of . . . [an] ex parte hearing, which was held on June 28, 2006" at which the court vacated the Agency's placement of J.J. with Marshall. Marshall also contends that "Harmelink failed to provide [Marshall] a copy of a [July 20, 2006] Addendum Report with sufficient time to afford her an opportunity to properly and competently defend against the accusations leveled against her."[11]

Marshall contends that these actions violated her constitutional right as a prospective adoptive parent, "to notice and 'a full hearing' before the adoptive placement can be terminated . . . ." (*Adoption of Baby Girl B.* (1999) 74 Cal.App.4th 43, 51.)

   b.      *The defense of qualified immunity*

"A government official sued under [section] 1983 is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct. [Citation] A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.' [Citation] In other words, 'existing precedent must have placed

---

11      Marshall's third and fourth causes of action are also premised in part on her claim that the social workers violated her due process right to be free from deception in the presentation of evidence to the courts. (See pt. III.B.3., *post*.)

16

the statutory or constitutional question beyond debate.' " (*Carroll, supra,* 135 S.Ct. at p. 350.) Further, the United States Supreme Court has " 'repeatedly told courts . . . not to define clearly established law at a high level of generality,' [citation] since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." (*Plumhoff v. Rickard* (2014) ___ U.S. ___ [134 S.Ct. 2012, 2023] (*Plumhoff*).)

The doctrine " 'protects "all but the plainly incompetent or those who knowingly violate the law" ' " (*Carroll, supra,* 135 S.Ct. at p. 350), and "applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.' " (*Pearson v. Callahan* (2009) 555 U.S. 223, 231 (*Pearson*).)

Finally, because "qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.' ]" (*Pearson*, *supra*, 555 U.S. at p. 231.) For this reason, the Supreme Court has " 'repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation.' " (*Id*. at pp. 231-232.)

        c.     *The manner by which Thompson and Johanesen provided notice of the Agency's intent to remove J.J. from her care did not violate Marshall's clearly established constitutional right*

Marshall contends that Thompson and Johanesen violated her constitutional right to due process by failing to provide her with notice of the June 28, 2006 ex parte hearing at which the court entered an order vacating J.J.'s placement with Marshall. Marshall argues that in failing to provide her with notice of the hearing, Thompson and Johanesen

violated her right "to notice and 'a full hearing' before the adoptive placement [could] be terminated . . . ." (*Adoption of Baby Girl B.*, *supra*, 74 Cal.App.4th at p. 51, citing, among other cases, *C.V.C. v. Superior Court* (1973) 29 Cal.App.3d 909 (*C.V.C.*).) We are not persuaded.

Marshall acknowledges in her complaint that on June 19, 2006, Johanesen "verbally informed her that [the Agency] was going to remove J.J. . . . ." Marshall further acknowledges that Johanesen told Marshall that "if [Marshall] objected to the removal, she would have to go to court and fill out some paperwork."

In providing notice in this manner, Johanesen complied with the statutory scheme governing the removal of a child from a prospective adoptive parent of a dependent child.[12] Welfare and Institutions Code, section 366.26, subdivision (n)(3) provides that "[p]rior to a change in placement and as soon as possible after a decision is made to remove a child from the home of a designated prospective adoptive parent, the agency shall notify . . . the designated prospective adoptive parent . . . of the proposal . . . ." Johanesen's June 19 verbal notice provided Marshall with notice of the Agency's intent to change the placement of J.J. prior to the actual change in placement, and Marshall presents no argument that the notice was not provided as soon as possible after the decision was made to remove J.J. from Marshall's home. Further, Marshall cites no authority indicating that the oral notice that Johanesen undisputedly provided is

---

[12]    We assume for purposes of this discussion that Marshall was a prospective adoptive parent in June 2006, notwithstanding that in July 2006, the trial court denied her request to be designated as such.

18

insufficient under Welfare and Institutions Code section 366.26, subdivision (n), and presents no argument that the form of notice mandated by statute fails to ensure the notice constitutionally required as stated in *Adoption of Baby Girl B.*, *supra,* 74 Cal.App.4th at page 51.

To the extent that Marshall may be understood to be contending that Thompson and Johanesen violated her right to due process by filing an ex parte application on June 28, because Marshall had filed an objection to the removal on June 26,[13] we reject this argument, as well. J.J.'s placement with Marshall was not terminated until October 6 when the Agency actually removed J.J. from Marshall, and the court held a hearing on July 20 (well before October 6) on Marshall's objection to the removal.[14] The liberty interest that invokes the protections of due process is notice and an opportunity to be heard before the child is *removed.* (See, e.g., *C.V.C., supra,* 29 Cal.App.3d at p. 920 ["Here petitioners were accorded a judicial hearing *before the child was removed* but the court erred to their prejudice by restricting its review"]; *Marten v. Thies* (1979) 99 Cal.App.3d 161, 169 ["The court in *C.V.C.* discovered that the Fourteenth Amendment's guarantee of due process requires that prospective adoptive parents be given notice and

---

13    Marshall filed a declaration stating that she served the Agency with her objection by way of certified mail on June 26. Johanesen and Thompson both stated in declarations that "[a]t no time before (and including) June 28, 2006 did I become aware that Ms. Marshall objected to the removal of J.J."

14    Welfare and Institutions Code section 366.26, subdivision (n)(3)(A) provides in relevant part: "Within five court days or seven calendar days, whichever is longer, of the date of notification [of the Agency's provision of notice of the proposal to remove a dependent child] . . . the designated prospective adoptive parent may file a petition with the court objecting to the proposal to remove the child . . . ."

19

an opportunity to be heard before the termination of status *and removal of the child* from the preadoptive placement except in extraordinary circumstances"].) Because J.J. was not removed from Marshall's home until more than three months after the ex parte hearing and *after* the court had conducted a hearing on Marshall's objection, Thompson and Johanesen's failure to provide Marshall with notice of the June 28 ex parte hearing did not violate Marshall's right "to notice and 'a full hearing' before the adoptive placement can be terminated." (*Adoption of Baby Girl B.*, *supra*, 74 Cal.App.4th at p. 51.)[15]

Accordingly, we conclude that the trial court properly determined that Thompson and Johanesen are entitled to qualified immunity with respect to Marshall's section 1983 claims against them insofar as those claims are premised on Thompson and Johanesen's failure to provide Marshall with notice of the June 28 ex parte hearing.

---

[15]    Marshall contends that, in light of *Rita M. I, supra*, D049099, the doctrine of collateral estoppel establishes that her "procedural due process rights were violated." In order for the doctrine of collateral estoppel to apply, " '[i]t must appear that the precise question was raised and determined in the former suit.' " (*Shopoff & Cavallo LLP v. Hyon* (2008) 167 Cal.App.4th 1489, 1520.) The *Rita M. I* court did not specifically address whether Rita's due process rights were violated by the Agency's failure to provide her with notice of the June 28 ex parte hearing. Accordingly, we reject Marshall's contention that the doctrine of collateral estoppel applies with respect to her contention that Thompson and Johanesen violated her right to due process by failing to provide her with notice of the June 28 ex parte hearing.

d.  *Harmelink's failure to provide Marshall with the July 20 addendum report prior to the hearing did not violate Marshall's clearly established constitutional right*

Marshall contends that Harmelink violated her right to due process by failing to provide her with a copy of the July 20 addendum report sufficiently in advance of the July 20 hearing to provide her with time to prepare a response to the Agency's "accusations." Citing this court's decision in *Rita M. I, supra*, D049099, Marshall contends that this action was "unfair, and was in violation of her due process rights."

Even assuming that Harmelink's failure to provide Marshall with the report until the commencement of the July 20 hearing violated Marshall's right to due process, Marshall has presented no authority or argument demonstrating that this failure violated a *clearly established* constitutional right (see *Carroll, supra,* 135 S.Ct. at p. 350 ["A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right' [citation]"]), and we are aware of no such authority.

We also reject Marshall's suggestion that Harmelink's failure to provide the report earlier violated Marshall's clearly established right to a "full hearing" before the termination of J.J.'s adoptive placement. (*Adoption of Baby Girl B.*, *supra*, 74 Cal.App.4th at p. 51). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." (*Plumhoff, supra*, 134 S.Ct. at p. 2023.) Since Marshall has pointed to no authority demonstrating that Marshall's right to a "full hearing" (*Adoption of Baby Girl B.*, *supra*,

21

at p. 51) encompassed the right to receive the report prior to the hearing, we cannot say that all reasonable social workers would have understood that failing to provide the report earlier violated this right.

Accordingly, we conclude that Harmelink is entitled to qualified immunity with respect to Marshall's section 1983 claims against her insofar as those claims are premised on Harmelink's failure to provide Marshall with a copy of the July 20 addendum report prior to the July 20 hearing.

3. *The social workers are entitled to qualified immunity as a matter of law on Marshall's claims premised on judicial deception*

a. *Marshall's claims*

Citing *Chism v. Washington State* (9th Cir. 2011) 661 F.3d 380, 388-389 (*Chism*), Marshall contends that the social workers violated her due process right to be free from governmental deception in the presentation of evidence during judicial proceedings. Marshall argues that the social workers violated this right by making deliberately false statements and failing to present material exculpatory evidence to the trial court in connection with the request to terminate J.J.'s placement with Marshall. Under *Chism*, in order to demonstrate a violation of her due process right to be free from judicial deception Marshall is required to make " 'a substantial showing of [the social workers'] deliberate falsehood or reckless disregard for the truth and . . . establish that, but for the dishonesty, the [termination of J.J.'s placement with her] would not have occurred.' [Citation.]" (*Chism*, *supra*, at p. 386.)

b. *Marshall had a clearly established constitutional right not to have J.J.'s placement terminated based on a social worker's statement that was either deliberately false or made with reckless disregard for its truth*

The social workers are entitled to qualified immunity unless they violated a "clearly established" constitutional right. (*Carroll, supra,* 135 S.Ct. at p. 350.) Marshall contends that she had a clearly established constitutional right not to have J.J.'s placement terminated based on a social worker's statement that was either deliberately false or made with reckless disregard for its truth. We agree.

In *Greene v. Camreta* (9th Cir. 2009) 588 F.3d 1011, 1034-1035 (*Greene*), vacated in part on other grounds by *Camreta v. Greene* (2011) ___ U.S. ___ [131 S.Ct. 2020] and vacated in part on other grounds by *Greene v. Camreta* (9th Cir. 2011) 661 F.3d 1201, the Ninth Circuit concluded that, *as of March 2003*, a parent had a clearly established right not to be subject to judicial deception perpetrated by a child protective services worker securing an order removing a child from the parent's custody. (*Greene, supra,* at p. 1035; see *id*. at p. 1018.) The *Greene* court reasoned:

> "[T]he right to be free from deception in the presentation of evidence during a protective custody proceeding was clearly established at the time Camreta [the child protective services worker] filed his affidavit with the Juvenile Court. In *Devereaux v. Perez,* 218 F.3d 1045 (9th Cir. 2000) [reh'g en banc granted by 235 F.3d 1206 and reh'g en banc (2001) 263 F.3d 1070], for example, we held in the context of a child abuse proceeding that 'the constitutional right to be free from the knowing presentation of false or perjured evidence' is clearly established. *Id.* at 1055–56. Even earlier, we stated emphatically that 'if an officer submitted an affidavit that contained statements he knew to be false or would have known were false had he not recklessly disregarded the truth, . . . he cannot be said to have acted in an objectively reasonable manner, and the shield of qualified immunity is lost.' *Hervey v. Estes,* 65 F.3d 784, 788 (9th

23

Cir. 1995) (internal quotations and citation omitted); *see also Butler* [*v. Elle* (9th Cir. 2002) 281 F.3d 1014, 1024]; *Whitaker* [*v. Garcetti* (9th Cir. 2007) 486 F.3d 572, 582] (concluding that 'the contours of the Fourth Amendment right against judicial deception' were clearly established by 1996). *See also Snell v. Tunnell,* 920 F.2d 673 (10th Cir. 1990) (holding social workers who deliberately fabricated evidence of child sexual abuse to secure a removal order not entitled to qualified immunity)." (*Greene, supra,* at pp. 1034-1035.)

We agree with *Greene*, and believe that its reasoning applies equally to statements made to a court by a social worker seeking the removal of a dependent child from a caregiver's custody.[16] (See *Devereaux v. Abbey* (9th Cir. 2001) 263 F.3d 1070, 1075 (en banc) (*Devereaux*) [" 'Precedent directly on point is not necessary to demonstrate that a right is clearly established. Rather, if the unlawfulness is apparent in light of preexisting law, then the standard is met. In addition, even if there is no closely analogous case law, a right can be clearly established on the basis of common sense.' "].) In light of long-standing *criminal* prohibitions on making deliberately false statements under oath,[17] no social worker could reasonably believe that she was acting lawfully in making deliberately false statements to the juvenile court in connection with the removal of a dependent child from a caregiver.[18] Since qualified immunity protects officials " 'who

---

[16]    "[A] foster parent has at least a 'limited constitutional "liberty" [interest]' in maintaining her relationship with the foster child." (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 815.)

[17]    Marshall notes that California has criminalized perjury since 1872. (See Pen. Code, § 118.)

[18]    The County's cursory attempt to distinguish *Greene* on the ground that the decision applies only to "protective custody warrants," is unpersuasive, since the object

24

act in ways they reasonably believe to be lawful' " (*Garcia v. County of Merced* (9th Cir. 2011) 639 F.3d 1206, 1208), we think that it is "virtually self-evident" (*Devereaux, supra,* 263 F.3d at p. 1075) that qualified immunity does not apply to such acts. (See *Walker v. City of New York* (E.D.N.Y. 2014) 63 F.Supp.3d 301, 312 ["It is axiomatic that a caseworker seeking the protection of qualified immunity cannot have utilized perjury and intentional fabrications during her investigation and in presenting a case to the Family Court"].)

Citing *Costanich v. Dep't of Soc. and Health Services* (9th Cir. 2010) 627 F.3d 1101, 1114 (*Costanich*), the County maintains that Marshall's "right not to have social workers present fabricated evidence against her in a civil juvenile dependency proceeding was not clearly established until 2010." We disagree.

To begin with, the County's argument that "*Costanich* is binding precedent on this court" is incorrect. (See, e.g., *Raven v. Deukmejian* (1990) 52 Cal.3d 336, 352 ["Decisions of the lower federal courts interpreting federal law, though persuasive, are not binding on state courts"]; *McLaughlin v. Walnut Properties, Inc.* (2004) 119 Cal.App.4th 293, 297 ["Since we are construing a federal statute, we must apply and interpret federal law. Decisions of the United States Supreme Court are binding. Lower federal court decisions, including those of the Ninth Circuit Court of Appeal, are not"].) In making this argument, the County also misapplies precedent holding that *federal district courts* must follow the decisions of the federal circuit courts of appeal (citing

of the social workers' statements in this case was the removal of J.J. from Marshall's physical custody.

25

*Hart v. Massanari* (9th Cir. 2001) 266 F.3d 1155, 1169 (*Hart*)). This court is not, as the County asserts, an "inferior court" to the Ninth Circuit, as the *Hart* court itself recognized. (*Ibid.* [distinguishing between "inferior courts" in the federal system and "state courts"].)

In any event, *Costanich* supports our conclusion. In *Costanich*, the Ninth Circuit considered, whether, *as of 2001*, an individual had a clearly established right not to be subjected to deliberately falsified information in a civil child abuse proceeding. (*Costanich, supra*, 627 F.3d at p. 1114-1115.) The *Costanich* court noted that in 2001 in *Devereaux, supra,* 263 F.3d 1070, the Ninth Circuit held " 'that there is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government.' " (*Costanich, supra*, at p. 1114, quoting *Devereaux, supra,* at 1074-1075.) The *Costanich* court concluded that the logic of *Devereaux* applies equally to *civil* child abuse proceedings, stating, "Although *Devereaux* does not specifically address civil child abuse proceedings, the right not to be accused based upon deliberately fabricated evidence is sufficiently obvious, and *Devereaux* is sufficiently analogous to the facts here, that government officials are on notice that deliberately falsifying information during civil investigations which result in the deprivation of protected liberty or property interests may subject them to [section] 1983 liability." (*Costanich, supra*, at p. 1115.)

We acknowledge that the *Costanich* court did state, "[G]iven the distinctions between criminal prosecutions [at issue in *Devereaux*] and civil foster care proceedings we cannot say that this right was clearly established *as of 2001*, when the conduct at issue

26

in this case occurred." (*Costanich, supra*, 627 F.3d at p. 1115, italics added.)[19]

However, even assuming we were to follow *Costanich*'s reasoning that, as of *2001*, an individual did not have a clearly established constitutional right not to be subjected to deliberately falsified evidence in connection with a civil child abuse investigation,[20] the acts that are alleged to have occurred in this case took place in 2006—five years after the Ninth Circuit's en banc decision in *Devereaux* and three years after the alleged acts at issue in *Greene*. Thus, *Costanich* does not support the County's contention that, as of 2006, Marshall did not clearly have such a constitutional right.

We are also aware that the *Costanich* court stated, "[G]oing forward, reasonable government officials are on notice that deliberately falsifying evidence in a child abuse investigation and including false evidentiary statements in a supporting declaration violates constitutional rights where it results in the deprivation of liberty or property interests, be it in a criminal or civil proceeding." (*Costanich, supra*, 627 F.3d at p. 1115.) However, this language cannot reasonably be read as a holding by the *Costanich* court that for acts occurring *after* 2001, no clearly established right existed, since this was not the question before the *Costanich* court.[21] Rather, we read the *Costanich* court's "going

---

19    The *Costanich* court did not cite *Greene*. At the time *Costanich* was decided, *Greene* was pending before the United States Supreme Court. (See *Camreta v. Greene* (2010) 562 U.S. 960 and *Alford v. Greene* (2010) 562 U.S. 960. )

20    We emphasize that we express no opinion on the correctness of this aspect of *Costanich* court's reasoning.

21    As the County recognizes, qualified immunity applies unless a government official violated a right that "was 'clearly established *at the time of the challenged conduct*.' "

27

forward" language (*ibid.*), as merely establishing that, for acts occurring after the publication of *Costanich*, government officials are indisputably on notice of the existence of a clear constitutional right to be free from judicial deception in civil child abuse proceedings affecting the custody of a child.

Accordingly, we conclude that as of the summer of 2006, Marshall had a clearly established constitutional right not to have J.J.'s placement terminated based on a social worker's statement that was either deliberately false or made with reckless disregard for its truth.

          c.     *The social workers are entitled to qualified immunity because there is no evidence from which a reasonable jury could find that J.J.'s placement with Marshall was terminated based on statements that were either deliberately false or made with reckless disregard for their truth*

Marshall's judicial deception claim is based on statements made by the social workers in the June 28 ex parte application and the July 20 addendum report. We consider Marshall's claims concerning each document, in turn.

Marshall contends that the June 28 ex parte application contained several statements that Thompson and Johanesen knew or should have known were false. First, Marshall argues that the statement that she had not complied with requests for an adoptive homestudy was false. Edwards stated in a declaration that, in March 2006, she gave Marshall several documents that had to be completed as part of the adoption

---

(Quoting *Ashcroft v. al-Kidd* (2011) ___U.S. ___ [131 S.Ct. 2074, 2080].) Thus, the *Costanich* court's qualified immunity holding was necessarily limited to a determination of whether a right was clearly established at the time that the challenged conduct at issue in that case occurred (i.e. *2001*). (*Costanich, supra*, 627 F.3d at p. 1115.)

homestudy process, including an Application to Adopt form. Edwards also stated that Marshall failed to return the forms. Marshall points to no evidence demonstrating that she in fact returned the Application to Adopt, or that Edwards's statement was false. Thus, a reasonable juror could not find that Thompson and Johanesen deliberately fabricated the statement, "Marshall has not complied with requests for the adoptive homestudy."

In a related argument, Marshall contends that the statement in the ex parte application that her "homestudy has been closed as unapproved," was false. In support of this contention, Marshall cites evidence that, at best, suggests that the Agency may have not have formally closed her homestudy application until shortly after the filing of the June 28 ex parte application. This evidence does not establish that the statement was materially false, since the gist of the statement was that the Agency had decided not to approve Marshall's home for J.J.'s adoption. Thus, a reasonable juror could not find Thompson and Johanesen liable for this statement.

Marshall further argues that the statement, "Marshall has been given the proper [statutory] notice," was untrue. We reject this contention for the reasons stated in part II.B.2.c, *ante*. Marshall also contends that the statement, "Marshall has made no attempt to contest the children's removal," was untrue as to J.J.[22] While Marshall presented evidence that she mailed the Agency her objection to the Agency's proposal to remove J.J. on June 26, there is no evidence that either Thompson or Johanesen was aware of this

---

[22]    Marshall does not dispute that the statement was true as to the other children mentioned in the ex parte application, C.B. and K.B.

objection on June 26 when they signed the application or on June 28 when they filed the ex parte application. Thus, there is no evidence on which a reasonable jury could find that Thompson or Johanesen deliberately fabricated the statement that Marshall had not attempted to contest J.J.'s removal.

Marshall also argues that because Johanesen was not J.J.'s social worker, she could not have had personal knowledge of the events described in the ex parte application, and thus, she committed perjury in submitting it to the court. We reject this argument because the vast majority of the statements in the ex parte application did not pertain to J.J., but rather, referred to the suitability of Marshall's home in general, as well as to issues related to K.B. and C.B. With respect to the one statement that arguably related only to J.J., i.e., the statement that Marshall had not complied with requests necessary to complete the adoptive homestudy, Marshall has failed to demonstrate that a reasonable juror could find the statement to be false. Thus, a reasonable jury could not find that Johanesen committed perjury in making this statement.[23]

Marshall also argues that Harmelink and Thompson deliberately fabricated several statements in their July 20 addendum report. To begin with, for the reasons stated above, we reject Marshall's arguments with respect to statements in the report to the effect that she not had complied with requests for the adoptive homestudy, and that the homestudy

---

[23]    Citing *Liston v. County of Riverside* (9th Cir. 1997) 120 F.3d 965, Marshall also contends that Thompson and Johanesen "suppressed known exculpatory evidence." We reject this argument because none of the statements that the social workers' omitted of which Marshall complains would have provided a basis for a reasonable jury to find that the social workers "intentionally or recklessly omitted facts required to prevent technically true statements in the [application] from being misleading.'" (*Id.* at p. 973.)

30

had been closed due to noncompliance. We also reject Marshall's contention that a reasonable jury could find that Harmelink and Thompson deliberately fabricated the statement that Marshall "has not made any significant step to initiate the process in becoming a prospective adoptive parent to J.J.," in light of undisputed evidence, discussed above, that Marshall had not returned a completed Application to Adopt form for J.J. We also reject Marshall's contention that Harmelink and Thompson deliberately fabricated a statement concerning when Marshall had begun to work on her adoptive homestudy, since, when read in context, the statement clearly pertained to the adoptive homestudy for C.B. and K.B., and Marshall does not contend that the statement was inaccurate as to these children.

Marshall also contends that Thompson and Harmelink deliberately falsified the following statement, "Marshall's boyfriend lives in the home with her and the children, yet she failed to disclose this information to the Agency." Marshall did state in a declaration that she had previously informed Harmelink that her boyfriend lived in her home. However, Marshall's boyfriend's residence was not among the factors that Thompson and Harmelink listed as a basis for their recommendation that J.J. be removed from the home. Accordingly, we conclude that a reasonable juror could not find that but for the alleged dishonesty with respect to Marshall's boyfriend's residence, the termination of J.J.'s placement with Marshall would not have occurred. The record thus does not contain a triable issue of material fact with respect to Marshall's claim that Thompson and Harmelink's July 20 addendum report violated Marshall's constitutional

31

right not to have J.J.'s placement terminated based on fabricated evidence. (See *Chism*, 661 F.3d at p. 386 [outlining elements of a judicial deception claim].)[24]

Accordingly, we conclude that the social workers are entitled to qualified immunity as a matter of law with respect to Marshall's section 1983 claims against them insofar as those claims are premised on their alleged violation of Marshall's right to be free from deception in the presentation of evidence by government agents during judicial proceedings.[25]

4. *The trial court properly granted judgment as a matter of law for the County on Marshall's section 1983 claim*

Marshall claims that the trial court erred in granting judgment as a matter of law for the County on Marshall's claim section 1983 claim.

a. *Governing law*

A municipality can be sued under section 1983 for "constitutional deprivations visited pursuant to governmental 'custom.' " (*Monell, supra,* 436 U.S. at pp. 690-691.) However, "Congress did not intend municipalities to be held liable unless action pursuant

---

[24]     Marshall also contends that the report contains a number of statements that were "presented out-of-context, and did not state the whole truth."  We have carefully reviewed the statements and conclude that, no reasonable juror could find that Thompson and Harmelink made deliberately misleading statements to the court in the July 20 addendum report.

[25]     In light of our conclusion that the social workers are entitled to qualified immunity with respect to all of Marshall's claims against them, we need not consider respondents' argument that the social workers are also entitled to *absolute* immunity for their actions. (See *Nader v. Blackwell* (6th Cir. 2008) 545 F.3d 459,478 (lead opn. of Boggs, C.J.) ["Given our holding that [defendant] has qualified immunity from suit, it is unnecessary for us to decide whether he also enjoys absolute immunity"].)

to official municipal policy of some nature caused a constitutional tort.  In particular,

 . . . a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in

other words, a municipality cannot be held liable under § 1983 on a *respondeat superior*

theory."  (*Id*. at p. 691.)

Thus, in order to establish her section 1983 claim against the County, Marshall

would be required to prove that a County employee committed a constitutional violation

*pursuant to* a formal governmental policy or a long-standing practice or custom which

constitutes the standard operating procedure of the County.  (See *Trevino v. Gates* (9th

Cir. 1996) 99 F.3d 911, 918.)  In order to make such a showing, Marshall would have to

"demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force'

behind the injury alleged," and establish a "direct causal link between the municipal

action and the deprivation of federal rights."  (*Bryan County Commissioners v.

Brown* (1997) 520 U.S. 397, 404 (*Bryan County*).)  Courts are required to "adhere to

rigorous requirements of culpability and causation," lest "municipal liability collapse[]

into *respondeat superior* liability."  (*Id*. at p. 415.)  This is because, as the United States

Supreme Court has "repeatedly reaffirmed," in enacting section 1983, "Congress did not

intend municipalities to be held liable unless *deliberate* action attributable to the

municipality directly caused a deprivation of federal rights."  (*Bryan County, supra*, at p.

415.)

b.     *Application*

Marshall's section 1983 claim against the County is based on the social workers' alleged violations of her constitutional rights discussed in part II.B.2., and part III.B.3., *ante*. With one exception, addressed below, we concluded that no reasonable juror could find that the social workers violated Marshall's constitutional rights. Thus, Marshall cannot prevail on her section 1983 claim against the County insofar as that claim is premised on either Thompson and Johanesen's failure to provide her with proper notice of the June 28 ex parte hearing or on the social workers' alleged judicial deception. (See, e.g., *Jackson v. City of Bremerton* (9th Cir. 2001) 268 F.3d 646, 653 ["Neither a municipality nor a supervisor . . . can be held liable under § 1983 where no injury or constitutional violation has occurred"].)

In accordance with this court's opinion in *Rita M. I*, *supra*, D049099, we assumed in part II.B.2.d., *ante*, and we similarly assume here, that Harmelink's failure to provide Marshall with the July 20 addendum report until the commencement of the July 20 hearing violated Marshall's right to due process. Accordingly, we must consider whether a County custom or practice was the "moving force" behind Harmelink's assumed violation of Marshall's constitutional rights. (*Bryan County, supra*, 520 U.S. at p. 415.)

At the outset, we acknowledge that Johanesen stated in a deposition that it was not the Agency's practice "to give ex partes, or addendums, or court reports to the caregivers" unless the caregiver was either a de facto parent or a "prospective adoptive parent that's

34

been given that status by the court."[26]  However, as the County correctly argues, Marshall "must show the [County's] *policies* caused her injuries, not just that the workers caused her injuries and they were following policies."  (Italics added.)  For the reasons discussed below, even assuming that a reasonable jury could find that Johanesen's testimony established a County custom, no reasonable jury could find that, through this custom, the County engaged in "*deliberate* conduct" that was the " 'moving force' behind" Marshall's injury.  (*Bryan County, supra*, 520 U.S. at p. 415.)

Importantly, Marshall has presented no argument that would indicate that the County's custom is, in and of itself, unconstitutional.  Further, as the *Rita M. I* , *supra*, D049099, court outlined, it was the *particular circumstances* of Marshall's case that gave rise to the due process concerns in this case.  Specifically, the *Rita M. I* court stated, "*This case* concerns us" (italics added), observing, "For more than two years, from November 2003, when J.J. was placed in Rita's home, until May 2006, the Agency social workers reported J.J. was thriving in Rita's home," and that the social workers had suddenly changed course in June of 2006 and decided to seek the removal of J.J.  It was *these circumstances*, of "*this case*" (*Rita M. I, supra*, D049099, italics added), and not the County's practice of not providing addendum reports to the caregivers of dependent children, that gave rise to Marshall's assumed constitutional injury.  The *Rita M. I* court outlined those circumstances as follows:

---

26    Marshall was not declared a prospective adoptive parent by the trial court until a proceeding that occurred after the filing of this court's opinion in *Rita M. I* on October 26, 2006.  (See *Rita M. II, supra,* D051025.)

"The circumstances of the case and the hearing lead us to conclude [Marshall] was not treated fairly. Although at the hearing [Marshall] was given the opportunity to present her objections, she was not presented with the social worker's addendum report until just before the hearing began. Indeed, the court needed to call a brief recess so [Marshall] could read the report. During the hearing, in response to [Marshall]'s question, the social worker acknowledged [Marshall] may not have been notified that she would not be approved to adopt the children in her home. [Marshall] expressed her confusion during the hearing, stating she could not understand why she would not be approved. This confusion is understandable in light of the fact that for the more than two years while [Marshall] was caring for J.J. in her home, the Agency continued to report that he was thriving and [Marshall] was providing loving care. The Agency acknowledges this and states in their brief it is unknown why the social workers overseeing [Marshall]'s foster care of J.J. were not aware of the CPS referrals against [Marshall]. In our view, it is inexcusable that the social workers who were monitoring a child's welfare in foster care did not know of numerous referrals against the foster parent. It is also disturbing that [Marshall] may not have been notified that she would not be approved to adopt and was not provided the social worker's report until the beginning of the hearing." (*Rita M. I* , *supra*, D049099.)

We agree with the sentiment expressed in *Rita M. I*, namely, that it was the particular circumstances of this case, and not a County policy of not providing addendum reports to the caregivers unless the caregiver was either a de facto parent or a "prospective adoptive parent that's been given that status by the court," that gave rise to the due process violation we have assumed here. In the absence of evidence that the County's custom was the "moving force" (*Bryan County, supra*, 520 U.S. at p. 415) behind Harmelink's assumed violation of Marshall's constitutional rights, the County cannot fairly be said to be the wrongdoer, and thus subject to section 1983 liability. (See *Collins v. City of Harker Heights* (1992) 503 U.S. 115, 122 ["The city is not vicariously

36

liable under § 1983 for the constitutional torts of its agents: It is only liable when it can be fairly said that the city itself is the wrongdoer"].)[27]

Accordingly, we conclude that the trial court properly granted judgment as a matter of law for the County on Marshall's section 1983 claim.

IV.

DISPOSITION

The judgment is affirmed.  Marshall is to bear costs on appeal.

_____

AARON, J.

WE CONCUR:

_____

NARES, Acting P. J.

_____

McINTYRE, J.

---

[27]    Marshall also contends that respondents proffered the declarations of several witnesses that were purportedly in conflict with the witnesses' deposition testimonies. For example, Marshall contends that "Johanesen, in her declaration, states that she 'prepared' the June 28, 2006 ex parte application, but at deposition Johanesen admits that Thompson drafted the ex parte application, and Johanesen only supplied her signature." Marshall fails to present any argument concerning how these purported inconsistencies were material to the trial court's summary judgment rulings or why such inconsistencies require reversal on appeal.  Accordingly, we conclude that Marshall is not entitled to reversal of the judgment based on these purported inconsistencies.

Marshall also claims that the trial court abused its discretion in overruling various evidentiary objections.  However, she fails to present any argument in her brief in support of this contention, and instead merely cites to portions of the clerk's transcript.  It is well established that an appellate court need not consider such improperly incorporated arguments.  (See, e.g. *Parker v. Wolters Kluwer United States, Inc.* (2007) 149 Cal.App.4th 285, 291.)  Accordingly, Marshall's contention in this regard is forfeited.